**AYERS, Michelle & Carlton and all
others similarly situated,
Appellants,**

v.

**The PHILADELPHIA HOUSING AU-
THORITY, Echols, Mary, acting indi-
vidually and in her corporate capacity,
and Kern, Gregory A., acting individu-
ally and in his corporate capacity, Ap-
pellees.**

No. 89–1632.

United States Court of Appeals,
Third Circuit.

Argued Dec. 14, 1989.

Decided July 30, 1990.

Rehearing and Rehearing In Banc
Denied Sept. 10, 1990.

---

**23.** A court may issue an appropriate injunction upon proof of a discriminatory plan under 29 U.S.C. § 1140.

Michael Donahue (argued), George D. Gould, Community Legal Services, Inc., Philadelphia, Pa., for appellants.

Terri W. Claybrook (argued), Susan F. May, Philadelphia, Pa., for appellees.

Before STAPLETON, GREENBERG and GARTH, Circuit Judges.

OPINION OF THE COURT

GARTH, Circuit Judge:

This case requires us to answer the following questions: (1) does Federal law preempt the application of Pennsylvania's regulations prescribing requirements and regulations for foreclosure and default notice before occupants of federally funded Turnkey III housing program may be removed from their residences? and if not, (2) did the Philadelphia Housing Authority (PHA) violate the procedural due process rights of Turnkey III homebuyers by failing to adhere to the requirements of Pennsylvania Act 6 (41 Pa.S.A. § 101 et seq.) and Pennsylvania Act 91 (35 Pa.S.A. § 1680.401c *et seq.*)? [1]

We hold that the application of the Pennsylvania Acts has been preempted and that hence no due process rights arising from the Pennsylvania Acts have been violated. Thus we hold that the district court erred in abstaining and we remand to the district court to permit Ayers, if desired, to amend the complaint to state an independent federal action. Failing such an amendment, we direct that the district court enter an order dismissing Ayers' complaint with prejudice.

I.

A.

The plaintiffs, Michelle and Carlton Ayers, ("Ayers") are the subject of eviction proceedings brought in Pennsylvania state court by the PHA. The PHA seeks to evict them from a HUD sponsored housing program know as Turnkey III. The Turnkey III housing program is a federal program designed to provide home ownership oppor-

---

1. See Appendix A attached to this opinion for excerpts from both Act 6 and Act 91.

tunities for low income families. It is funded through the United States Department of Housing and Urban Development (HUD) and is subject to detailed federal regulation. These regulations cover virtually every aspect of the relationship between the tenants/purchasers and the landlord/seller—in this case the PHA as a HUD agent.

The program works in the following manner. PHA acquires low rent housing developments with the financial assistance of HUD, and owns the homes until title is transferred to a homebuyer. PHA is responsible for the management of the program. To be eligible for the program, low income families must meet certain income guidelines.[2] Once the PHA determines that a family is income eligible, the family is placed on a waiting list. The priority the family receives is determined by the PHA in accordance with HUD regulations. After a family is accepted into the program, but before the family may occupy a Turnkey III residence, the family must execute a Homebuyers Ownership Opportunity Agreement ("HOOA"). The HOOA is a contract between the occupant family ("homebuyer") and the PHA. The HOOA specifies the obligations of the homebuyer and many of the obligations of the PHA.[3]

The unique characteristic of this program is that participating residents in the program may, through the procedure described in the regulations, actually purchase their residences and become homeowners. The regulations provide two methods by which a homebuyer may purchase the home, both of which relate to his paying a percentage of his expenses into various HUD accounts; see 24 C.F.R. § 904.107 (See Appendix B attached to this opinion).

PHA owns operates and manages two Turnkey III developments in the City of Philadelphia: Brown Street Village and Whitman Park. These two developments have a total of 196 units. PHA has operated the Brown Street Village Turnkey III development since 1981 and the Whitman Park Turnkey III development since 1982. Families have resided in these developments since the PHA began managing them.

### B.

The Ayers entered into a HOOA with the PHA in May 1981. To obtain title to the property under homebuyer program, they made monthly payments to the PHA until 1987. In May 1987 Mr. Ayers suffered an injury which reduced the family income. In March 1988, Mr. Ayers lost his job, and, as a result of this income loss, the Ayers were unable to continue their monthly payments to the PHA, leading to the eviction proceedings which have given rise to the present federal action.

### C.

The present dispute arises out of PHA's procedure for terminating a HOOA when

---

**2.** The family must be a "low income family," see 24 C.F.R. § 904.104(b), but must have sufficient income to meet HUD's standards for home ownership potential, see 24 C.F.R. § 904.104(e)(2). See Appendix B for the relevant sections of 24 C.F.R. § 904.101 *et seq.*

**3.** Essentially, the homebuyer is required to make monthly payments to the PHA based on the homebuyer's income. These payments are first credited to the Earned Home Payments Account ("EHPA"). The EHPA is generated by the homebuyer's monthly payments for the purpose of purchasing the home. If the HOOA is terminated, or if the homebuyer vacates the home, the homebuyer is entitled to receive the amount of the EHPA less any money owed by the homebuyer to the PHA. If the monthly payment by the homebuyer exceeds the required EHPA contribution, the balance is credited to the homebuyer's Nonroutine Maintenance Reserve Account ("NRMR"). The purpose of the NRMR is to provide funds for the nonroutine maintenance of the home. If the HOOA is terminated, or if the homebuyer vacates the home, the homebuyer does not receive any balance in the NRMR, nor is the homebuyer required to pay any deficiency in that account. If the homebuyer purchases the home, the balance of the NRMR is paid to the homebuyer at settlement. Any deficit in the NRMR account must be paid by the homebuyer at settlement. The HOOA also requires the homebuyer to be responsible for all routine maintenance of the home. Maintenance of common areas and nonroutine maintenance are not the responsibility of the homebuyer. There is a very limited right of survivorship specified by the regulations at 24 C.F.R. § 904.107(1).

homebuyers have *not* complied with their contractual obligations—typically the nonpayment of monies due. In such cases, where homebuyers have not met their obligations under the HOOA, PHA has commenced eviction actions against those homebuyers in the Philadelphia Municipal Court, which has jurisdiction over landlord-tenant actions pursuant to 42 Pa.C.S.A. § 1123(a)(3).

Ayers, as the potential class representative for a group of similarly situated residents, argues that PHA wrongfully considers Turnkey III homebuyers to be "tenants" under Pennsylvania law. Rather, Ayers contends, the HOOA constitutes an "installment land sale contract," and, as such, PHA may not commence eviction actions against homebuyers in the Philadelphia Municipal Court, but must eject homebuyers in an action to quiet title in the Court of Common Pleas, the court statutorily entitled to settle such disputes.[4]

More significantly, under the Pennsylvania Acts, Ayers seeks to require PHA to give notice of default and notice to cure to homebuyers before proceeding to evict them, as required by the Acts. The essential purpose of Act 6 notice is "to give the borrower the opportunity to cure any defaults that may have occurred in the loan agreement and to take advantage of various consumer protection devices extended by the Act before the home is seized."[5] Pennsylvania Act 91 notice is, on the other hand, "designed to give a homeowner the chance to apply for a state loan to help pay off the mortgage in situations where the homeowner cannot meet his mortgage payments because of unemployment, before foreclosure occurs."[6]

Specifically, Act 6 provides that a mortgagee must give thirty days notice before accelerating or commencing foreclosure; 41 Pa.S.A. § 403. The notice must inform the debtor of its right to cure the default at any time up to one hour prior to the sale of the residence and that this right may be exercised as many as three times a year. Curing such a default restores the residential debtor to the same position as if the default has not occurred; *id.* at § 404.

Act 91 complements the procedural requirements of Act 6 by providing access to sources of funding for a debtor in order to prevent default. The Act includes provisions for a debtor to obtain a loan from the state of Pennsylvania in order to prevent default; 35 Pa.S.A. § 1680.401c. In addition, prior to foreclosure the mortgagee must grant the debtor a 30 day period in which to meet with a consumer credit counseling agency or the mortgagee; 35 Pa. S.A. § 1680.403c. If such a meeting occurs, an additional 30 day period is mandated ostensibly for the debtor to obtain financing. These procedures are available to the debtor three times each year. If the debtor applies for assistance from the state's Homeowner's Emergency Assistance Program, foreclosure of the debtor's residence may again be delayed for a maximum of 60 days until eligibility for that program is determined. Under the combined effect of the two Pennsylvania Acts, foreclosure may therefore be delayed for in excess of four months.

PHA concedes that it does not comply with the requirements of Acts 6 and 91, but argues that Act 6 and Act 91 do not apply because the Turnkey III housing project is a federal program and that the applicable federal regulations preempt state law with respect to the procedure to be followed and the substantive rights available to the residents prior to eviction. PHA also argues that regardless of the state court which hears these proceedings, federal law pro-

---

4. Pennsylvania Rule of Civil Procedure 1061 states:

(a) Except as otherwise provided in this chapter, the procedure in the action to quiet title from the commencement to the entry of judgment shall be in accordance with the rules relating to a civil action [in the Court of Common Pleas].

5. *Bennett v. Seave,* 520 Pa. 431, 554 A.2d 886, 892 (Pa.1989) (Papadakos, J., concurring); and see Appendix A. infra.

6. *Id.*

vides the relevant rule of decision.[7] Ayers brought an action under 42 U.S.C. § 1983, 1985 and 1988 alleging that Acts 6 and 91 governed foreclosure against residential real estate in Pennsylvania and that the actions of the PHA in seeking eviction without compliance with the provisions of Acts 6 and 91 violated their federal rights. They sought a declaratory judgment and sought to enjoin the PHA from conducting any further evictions without complying with Acts 6 and 91. The PHA moved under a Fed.R.Civ.Pro. 12(b)(6) for dismissal of the complaint. Ayers moved for a preliminary injunction.

### D.

The district court declined to grant Ayers' motion for a preliminary injunction. Rather it dismissed the complaint on PHA's motion and it did so on abstention grounds. In dismissing the complaint, it did so without prejudice to the rights of Ayers to refile this case in state court, or to refile this case in federal court after the state law issues had been resolved. The district court stated:

> The crucial question in this case is whether Turnkey III homebuyers are tenants subject to eviction or whether they are sufficiently similar to mortgagors to require ejection in the Court of Common Pleas and Act 6 and Act 91 notice. Both parties in this case argue that Pennsylvania law is clear on this issue; however, both parties reach different conclusions.

> \*     \*     \*     \*     \*     \*

> Because of the ambiguities created by applying Pennsylvania law to the HOOA, I am forced to invoke the doctrine of *Pullman* abstention. In *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 ... (1941), the Supreme Court held that "federal courts should abstain from decision when difficult and unsettled questions of state law

must be resolved before a substantial federal constitutional question can be decided." *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2326, 81 L.Ed.2d 186 (1984).

*Ayers v. Philadelphia Housing Auth.,* 716 F.Supp. 855, 859 (E.D.Penn.1989).

Although a decision to abstain is reviewed for abuse of discretion, the district court's underlying legal determinations upon which it based its decision to abstain are subject to plenary review; see *United Services Automobile Assoc. v. Muir,* 792 F.2d 356 (3d Cir.1986) *cert. denied,* 479 U.S. 1031, 107 S.Ct. 875, 93 L.Ed.2d 830 (1987). However, a "district court has little or no discretion to abstain in a case that does not meet traditional abstention requirements" *Muir,* 792 F.2d at 361.

We review a denial of a preliminary injunction for abuse of discretion, an error of law, or a clear mistake in evaluation of the proof; *Moteles v. University of Pennsylvania,* 730 F.2d 913, 918 (3d Cir.1984) ("We have consistently held that our review of the grant or denial of preliminary injunctions is limited to determining whether there has been an abuse of discretion, an error of law, or a clear mistake in the consideration of the proof.")

Upon review of the relevant HUD regulations, we determine that as a matter of law the federal regulations codified in 24 C.F.R. § 904.101 *et seq.*[8] preempt the application of the Pennsylvania Acts to the Turnkey III program, thus making it irrelevant for our purposes whether under state law, Turnkey III residents should be considered tenants or homebuyers. Whatever their status as residents, because the federal regulations control, Pennsylvania's Acts 6 and 91 have no application to them. Inasmuch as the rights of the residents of Turnkey III housing may not be affected by Pennsylvania's Acts 6 and 91, no basis

---

7. We have been informed by the PHA that the Municipal Court of Philadelphia is currently processing PHA's applications to remove residents of Turnkey III program; see Supplemental Memorandum of the PHA, page 5.

We need not decide which Pennsylvania court is the proper forum for the removal of residents of the Turnkey III program. That issue remains for decision by the state courts.

8. See Appendix B, infra.

exists for the district court's invocation of the abstention doctrine as there are no outstanding issues of Pennsylvania law for determination.

## II.

Preemption of state law occurs in three distinctly different ways. Congress may, by the terms of a statute, preempt state law by explicitly stating that it is doing so; *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Congress may also preempt state law by using language, which, although not explicitly preemptive of state law, signals a Congressional intent to completely occupy a field; *Fidelity Federal Savings & Loan v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Finally federal law always preempts state law if the state law is in actual conflict with federal law; *International Paper Co. v. Quellette,* 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987).[9]

Nor is there any doubt that federal regulations, just as federal statutes, can create a conflict between state and federal law which would result in the federal preempting of conflicting state regulations. As the Supreme Court stated in *Fidelity Federal Savings,* 458 U.S. at 153–54, 102 S.Ct. at 3022–23:

> Federal regulations have no less preemptive effect than federal statutes. Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded

his statutory authority or acted arbitrarily

\*    \*    \*    \*    \*    \*

A pre-emptive regulation's force does not depend on express congressional authorization to displace state law; moreover whether the administrator failed to exercise an option to promulgate regulations which did not disturb state law is not dispositive.

Thus, to the extent that the provisions, procedures and protections of Act 6 and Act 91 are found to be in conflict with the relevant federal regulations, the federal regulations must displace and preempt the state law as to Turnkey III residents.[10]

## III.

■ It is conceded that explicit preemption has not occurred, inasmuch as the statutory language used by Congress is devoid of any reference to preemption.[11] That does not, however, end our inquiry. We must now examine the federal regulations to determine if preemption should be implied from the scope of the regulations or, if the regulations are in actual conflict with the requirements of Acts 6 and 91—in which case, Acts 6 and 91 are preempted.

As an initial matter, we must determine whether the HUD regulations can be read in a manner which incorporates by reference the requirements of Act 6 and Act 91. If HUD's requirements do no more than incorporate the substance of the Pennsylvania Acts, then obviously there would be no preemption of Pennsylvania law as both federal and state requirements would be identical. On the other hand, if we deter-

---

**9.** See also *California v. Federal Energy Commission,* —— U.S. ——, 110 S.Ct. 2024, 109 L.Ed.2d 474 (1990) (Federal Power Act preempts California's minimum stream flow requirements); *North Dakota v. United States,* —— U.S.——, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990) (North Dakota may regulate liquor sales on military bases. Such regulations are not preempted); *English v. General Electric,* —— U.S. ——, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (Energy Reorganization Act of 1974 does not preempt common law torts for intentional infliction of emotional distress.)

**10.** Ayers claims that "there is a presumption against finding preemption in areas traditional-

ly regulated by the states" (Ayers, Supp.Mem. p. 5) and that "Act 91 and Act 6 are consumer protection statutes, an area traditionally regulated by the states" (*id.* p. 2). We do not argue with either statement, but we know of no authority whereby a state can protect its consumers from the enactments of the federal government other than by act of Congress; see *Garcia v. San Antonio Metro. Trans. Auth.,* 469 U.S. 528, 547–555, 105 S.Ct. 1005, 1015–1019, 83 L.Ed.2d 1016 (1985).

**11.** See 42 U.S.C. § 1437 *et seq.*

mine that Pennsylvania law differs from the provisions of the federal regulations, we are mandated to resolve any conflicts between the two legal systems in favor of federal law.[12]

The Supreme Court, in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728–29, 99 S.Ct. 1448, 1459, 59 L.Ed.2d 711 (1979), fashioned a three factor test to determine when, as a general matter, Congress intended to incorporate into Federal law a state's law regulating a particular program which has features that are common to both the federal and state law. The first factor to be considered is whether the particular program requires a uniform law to govern throughout the nation. Second, even when a nationwide uniform law is not required for the proper functioning of the program, we must still determine if the "application of [the specific] state law would frustrate specific objectives of the federal programs." *Id.* Finally, we must consider whether requiring the application of a uniform federal rule "would disrupt commercial relationships predicated on state law." *Id.*

Applying these three factors in *Kimbell,* the Court determined that a nationwide uniform law was not required to protect federal rights in the context of the Small Business Administration ("SBA") and the Federal Housing Authority ("FHA") loan programs. The Court held that the relative priority of the various liens should be governed by state, rather than federal law, even when, as in *Kimbell,* it deprived the federal government of its ability to recoup United States loans made under the federal Act. The Court focused extensively on the presence of third-party creditors who, if federal lien law prevailed, would be affected in a manner contrary to their commercial expectations—which expectations had been derived from relevant state law. The court reasoned:

[i]n structuring financial transactions, businessmen depend on state commercial law to provide the stability essential for reliable evaluation of the risks involved.... Because the ultimate consequences of altering settled commercial practices are so difficult to foresee, we hesitate to create new uncertainties in the absence of careful legislative deliberation ... Thus the prudent course is to adopt the ready-made body of state law as the federal rule of decision until Congress strikes a different accommodation.

*Id.* 440 U.S. at 739, 99 S.Ct. at 1464.

A similar result was reached by this court in *U.S. v. Walter Dunlap & Sons, Inc.,* 800 F.2d 1232 (3d Cir.1986) where we held that state law should be used to determine the status of a lien on collateral for a loan made by the Farmers Home Administration ("FmHA"). Under the relevant Pennsylvania statute,[13] acquiescence in the sale of collateral by the lienholder voids the lien, whereas the relevant FmHA regulations, 7 C.F.R. § 1962.18(b), require a written release from the FmHA signed by the FmHA Supervisor and the application of the funds to the FmHA to repay money owed.

In *Walter Dunlap* the defendants were commission brokers who sold, at auction, livestock that had been pledged as collateral to the FmHA. The brokers, who were not aware of the liens, sold the cattle and collected their commissions. The FmHA sued the brokers to recover the proceeds, arguing that the liens were not properly released since the money collected by the sale was never applied to loans owed to the FmHA, as required by FmHA regulations (7 C.F.R. §§ 1962.17–18) and that thus the brokers had improperly converted FmHA property. The brokers argued that under applicable state law, the liens had been

---

12. *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824).

13. See 13 Pa.C.S.A. § 9306(b) which states:
    (b) *Continuity of Security Interest in Collateral and Identifiable Proceeds.*
        Except where this division otherwise provides, a security interest continues in collat-

eral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.
See also U.C.C. § 9–306.

released, since the FmHA consented to the sale.

Relying on *Kimbell,* this Court's analysis in *Dunlap* held that it was the state law which was controlling. This was so, the Court reasoned, even when the agency regulations appeared on their face to cover Dunlap's precise situation, since

> there is no indication that Congress intended an agency regulation to supersede long-standing uniform state law, we decline to accept the government's position that the regulations control.[14]

*Dunlap,* 800 F.2d at 1239.

*Dunlap,* like *Kimbell Foods,* differs markedly from the instant case in that both *Kimbell* and *Dunlap* addressed the rights of third-parties who rightfully assume that the state law, which is the law routinely utilized in structuring their transactions, would govern their business dealings. Such is not the case here, however, where no third parties are involved and where all of the members of the class are participants in the federal program as residents of the Turnkey III housing.

It is essentially for this reason—an absence of third party participants—that we held in *U.S. v. Spears,* 859 F.2d 284, 289–290 (3d Cir.1988) that the FmHA was not required to comply with the requirements of Act 6 and Act 91 when it foreclosed on properties within Pennsylvania whose owners were delinquent in their payments to the FmHA. We stated:

> In both *Kimbell Foods* and *Walter Dunlap,* the aggrieved parties were not participants in the federal program. They would have been prejudiced by a federal rule preempting the state system of lien priorities of general applicability—statutes "on which private creditors base their daily commercial transactions." *Kimbell Foods,* 440 U.S. at 729, 99 S.Ct. at 1459. Noting that businesses look to state commercial law in evaluating risks of financial transactions, the Court observed that "[c]reditors who justifiably rely on state law to obtain

superior liens would have their expectations thwarted whenever a federal contractual security interest suddenly appeared and took precedence." Id. at 739, 99 S.Ct. at 1464.

In contrast, when the controversy does not affect third parties but embroils only the United States and a debtor, the factors that favor applying state law are considerably weakened if not removed entirely from consideration.

\*     \*     \*     \*     \*     \*

In *Kimbell Foods* and *Walter Dunlap* the critical factor counselling application of state law was the threat to commercial relationships founded on expectations of third parties relying on existing state statutes. In those cases, lien priorities had been established by an intricate network of state laws regulating commercial activities in which federal programs were intruding. Federal interests would not suffer, and private businesses would benefit, by accommodating state law. On balance, therefore, it was preferable in both instances to utilize that law as the rule of decision.

\*     \*     \*     \*     \*     \*

Because no commercial interests or third parties are affected by the utilization of federal procedures, the rationale of the *Kimbell–Dunlap* analysis is not controlling. As in *West Virginia,* "this case presents no compelling reason for [adoption of state law]." *West Virginia v. U.S.,* 479 U.S. 305 at 309, 107 S.Ct. 702, at 705, 93 L.Ed.2d 639 (1987). Accordingly, the FmHA should be permitted to carry out its task of servicing mortgages under the procedures it selects.

IV.

A.

*Spears'* holding, that Acts 6 and 91 do not apply to FmHA foreclosures brought in federal court, has equal force in the instant proceeding where the PHA has brought its

---

**14.** Alternatively, *Dunlap* held that even if the FmHA regulations governed, the proceeds of the sale were properly applied inasmuch as consent had been received in accordance with FmHA's regulations; 800 F.2d at 1240.

proceeding in state courts. None of the factors found in either *Kimbell* or *Walter Dunlap*, which favor the incorporation of state law into federal law, are present here. As we have earlier discussed, the record reveals there are no third parties present in this case who would normally rely on state law. Rather, all of the individuals affected by the foreclosure practices of the PHA are participants in the federal housing program, reside in its different housing units, and are subject to only one system of foreclosure and eviction—the federal procedure as codified in the 24 C.F.R. § 904.101 *et seq.* (See Appendix B, infra.)

As an additional matter, the application of Pennsylvania law, in this case Acts 6 and 91, would frustrate many of the specific objectives of the Turnkey III housing program, a program which has been referred to as "the greatest innovation in public housing." [15] Specifically, compliance with Acts 6 and 91 would prevent the PHA from reacting swiftly to changes in the financial circumstances of the residents. The ability to react swiftly is not limited solely to the eviction of a resident delinquent in its payments. Aid to the resident who experiences financial difficulties may require prompt PHA action. For example, a resident who fails to make payments can be transferred to a rental unit and thereby be relieved of the burden of making substantial purchase payments while still being offered the benefits of public housing.[16]

Moreover, a detailed comparison of the Pennsylvania statutes with the HUD regulations, indicates that the Pennsylvania Acts are clearly incompatible with the requirements of Federal law. For example, 24 C.F.R. § 904.107(m)(1) states that "the LHA [the Local Housing Authority, in this case the PHA] may terminate the Agreement. No termination under this paragraph may occur less than 30 days after the LHA gives the homebuyer notice of its intent to do so in accordance with paragraph (m)(3) of this section." On the other

hand, the provisions of Act 6 and Act 91 permit delaying termination, and hence eviction, for more than four months after the first notice of default is given. (See Appendix A, *infra.*) These procedures directly conflict with the interests of HUD and the PHA, which require, with respect to the termination of a HOOA that the PHA must make a final determination "no later than 90 days from the date of evaluation of the results of the initial investigation" 24 C.F.R. § 904.107(*o*).

#### B.

Additionally, the HUD regulations provide for counselling of residents prior to termination proceedings as may be feasible in order to help the family overcome the deficiency as promptly as possible; see 24 C.F.R. § 904.107(*o*)(1). Such counselling, while an integral part of the PHA, is not intended to delay the remedies mandated in the event default occurs and which are mandated by the regulations. The federal regulations seek a swift adjudication of rights. On the other hand, Act 91, as we have pointed out, permits a mortgagor to remain in possession while seeking assistance from the Pennsylvania Emergency Mortgage Assistance Program and receiving counselling from various other agencies. During the counselling process, eviction is not permitted. Under the provisions of Act 91, up to a four month delay in eviction can be effected. Moreover, under Act 6, a mortgagor's default may be cured three times in any calendar year by the mortgagor proffering payment up to one hour prior to a judicial sale of his residence. Thus, it is possible that by combining the provisions of Act 6 and Act 91, a mortgagor can forestall foreclosure far beyond the times mandated by federal regulation.

Moreover, Act 91 has numerous detailed procedural requirements, and specifically regulates what type of information must be put into termination notices.[17] So too, Act

---

15. Catz, *Historical and Political Background of Federal Public Housing Programs,* 50 N.D.L.Rev. 25, 39 (1973).

16. See 24 C.F.R. § 904.107(*o*)(2) (Appendix B, infra).

17. Specifically, the notice requires a listing of the various consumer credit counseling agencies

6, which "is designed, in part, to give the borrower the opportunity to cure any defaults that may have occurred in the loan agreement and to take advantage of various consumer protection devices extended by the Act before the [mortgaged] home is seized and sold by the sheriff" [18] is in conflict with the extensive regulation of the termination process as found in 24 C.F.R. § 904.101 *et seq.* These HUD regulations provide extensive and detailed contractual language which must be incorporated in each and every PHA contract and which expressly provide for the type and form of notices to be provided—notices which differ in both substance and procedure from the notices prescribed in the Pennsylvania Acts.[19]

We recognize, as Ayers argues, that the notice requirements found in Act 6 and 91 by themselves are not necessarily onerous or burdensome. However, the fact that they differ materially from the notice requirements of the federal regulations and do not correspond to the specific requirements of those regulations, persuades us that, for this reason alone, they cannot be enforced. Moreover, because we are convinced, and we hold, that the federal regulations preempt Acts 6 and 91 in all particulars, we cannot accept the suggestion of Ayers that even if the substantive provisions of both Acts 6 and 91 are preempted, the notice provisions of both Acts should nevertheless remain operative. Requiring PHA to provide the "Notice of Rights"

required under Pennsylvania law when no substantive rights under Pennsylvania law can actually inure to a resident will only add to the PHA's obligations without any benefit to the homebuyers.

## C.

We find additional support for our conclusion that Act 6 and Act 91 are preempted from the concluding paragraph of the federal regulation (24 C.F.R. § 904.121) which states:

No modification may be made in format, content or text of these Appendices except (1) as required under state or local law as determined by HUD or (2) with approval of HUD.

This provision buttresses our analysis which holds the federal rule of decision must preempt Acts 6 and 91. It is significant to us that the federal law mandates that any and all modifications to HUD's regulations, even modifications required by state law, must in the first instance be approved by HUD. HUD alone can determine which, if any, state or local rules are to be enforced. This provision, when given effect, subordinates all state law requirements that are in conflict with HUD's rules to HUD's own regulations. In the absence of any HUD approved modifications, this provision without more counsels that the provisions of Acts 6 and 91 must be deemed inoperative and inapplicable to Turnkey III federal housing.[20]

and a statement of the resident's rights under various laws; see 35 Pa.S.A. § 1680.403c(b).

**18.** *Bennett v. Seave,* 520 Pa. 431, 554 A.2d 886, 892 (1989) (Papadakos, J., concurring).

**19.** See 24 C.F.R. § 904 Appendix I (Annual Contributions Contract), Appendix II (Homebuyers Ownership Opportunity Agreement); Appendix III (Certification of Homebuyer Status); Appendix IV (Promissory Note for Payment Upon Resale by Homebuyer at Profit).

**20.** We are not alone in holding that HUD's Turnkey regulations preempt state law where conflicts such as we have identified exist—conflicts which would dilute the force and effect of the federal regulations. Some lower state court decisions have previously addressed the issue of whether HUD's Turnkey regulations preempt

state law to the extent that the state's law is in conflict with federal regulation.

In *Marino v. Town of Ramapo,* 68 Misc.2d 44, 326 N.Y.S.2d 162, 182 (1971) the court discussed at great length whether New York State's competitive bidding laws can be applied to Turnkey housing notwithstanding that HUD regulations mandated a different method of bid solicitation. The court ruled that New York's laws are "violative of the Supremacy Clause and must yield to HUD regulations" since to the extent they are in conflict, the New York laws are preempted by the relevant Turnkey regulations.

In *U.S. Con. & Con., Inc. v. Cuyahoga M.H. Auth.,* 35 Ohio App.2d 159, 300 N.E.2d 452 (1973) a similar challenge to the issue presented in *Marino* involved Ohio's competitive bidding statutes. Unlike *Marino,* however, the Ohio court held that no conflict between HUD regulations and Ohio law existed. The *Cuyahoga* court stated that "there is no [actual] conflict

## V.

We have held that because Pennsylvania Acts 6 and 91 are in conflict with the parallel provisions of the federal regulation as codified in 24 C.F.R. § 914.101 *et seq.* they are accordingly preempted. Having so held, we need not address the argument advanced by Ayers that PHA has violated the due process rights of the Turnkey III housing residents. Our holding of preemption renders that argument irrelevant. If it is federal law which provides the rule of decision, then obviously Ayers may not seek vindication of state procedural rights which are predicated on state law. Thus our affirmative answer to the first inquiry posed: (page 2, *supra*) "does Federal law preempt the application of Pennsylvania's regulations prescribing requirements and regulations for foreclosure and default notice before occupants of federally funded Turnkey III housing program may be removed from their residences?" renders moot the second issue Ayers has raised—whether state procedural due process rights were violated.

## VI.

■ Although Ayers' brief does not specifically call our attention to any violation by the PHA of the PHA's own regulations, we observe that the complaint, which the district court erroneously dismissed on abstention grounds, claims that the PHA violated provisions of "the Home Buyers Ownership Opportunity Agreement and the Federal Regulations." Complaint paragraph 48. In its opening brief, Ayers also claims that the PHA "routinely violate[s] the due process rights of Turnkey III home buyers." Appellee's brief 30–31.

As we understand Ayers' argument, Ayers' complaint alleges that the PHA's violation of its own regulations stems from its refusal to comply with the provisions of Pennsylvania's Acts 6 and 91. Nevertheless, some of the language found in Ayers'

brief and complaint is sufficiently equivocal that we cannot say that a pure and independent federal claim has not been asserted. This is particularly so since the PHA's motion to dismiss was brought under Federal Rule of Civil Procedure 12(b)(6) which requires all well-pleaded allegations to be taken as true. Thus, an allegation that a federal regulation had itself been violated by PHA could give rise to a federal cause of action.

Because of the manner in which this case arose and the district court's disposition on abstention grounds, we cannot however, be certain that such an independent federal right has been alleged by Ayers. On the other hand, if given the opportunity to amend that portion of its complaint which ambiguously asserts a violation of federal regulations, Ayers might be able to state an appropriate federal claim, independent of PHA's non-compliance with Acts 6 and 91.

Accordingly, we will give Ayers the opportunity, if desired, to amend the complaint to state a pure federal claim—a claim that does not rely or depend upon the PHA's compliance with Pennsylvania's Acts 6 and 91.

## VII.

### A.

■ Having concluded that the federal regulations preempt Acts 6 and 91, we hold that the district court did not properly exercise its discretion by ordering abstention—abstention which sought to have the Pennsylvania courts resolve the issue of whether Ayers were "tenants" or "landowners" under Pennsylvania law. Inasmuch as federal law governs the proceedings of the PHA, the particular Pennsylvania forum in which the federal law is applied is irrelevant to the instant proceeding. As we have indicated (in note 7, *supra*), it will be

between federal law and regulations and Ohio law in regard to [Turnkey] housing" and that Congress did not intend to prevent state regulation where it did not conflict with and was compatible with the HUD regulations. *Id.* 300 N.E.2d at 457.

See also *Housing Authority of Newark v. Sagner*, 142 N.J.Super. 361 A.2d 565, 570 (1976) ("there is no conflict between the federal housing act [Turnkey regulations] and New Jersey law" as to the manner by which title was conveyed to the Newark Housing Authority.)

for the Pennsylvania courts to resolve the question of the proper forum, without further recourse to the federal courts as permitted by the district court's order. Accordingly, PHA is not required to comply with the provisions of Acts 6 and 91 regardless of the state court in which it proceeds against the Turnkey III housing residents.[21]

## B.

■ Despite our holding that the district court abused its discretion by abstaining, we nevertheless affirm the district court's denial of Ayers' motion for a preliminary injunction. The district court, in its opinion, did not specify the basis on which it denied Ayers' injunction, but it is clearly evident from the district court's opinion that the district court, by focusing entirely on the issue of abstention, remitted to the state courts the task of granting or denying the injunctive relief sought by Ayers.

The district court order of June 27, 1989 in relevant part provided:

[T]he Court having found that abstention is appropriate in this case, it is ordered that:

1. The Motion of the plaintiffs, Michelle Ayers, Carlton Ayers and Sadie Noland,[22] for a Preliminary Injunction is denied; and,

2. The Motion of the Defendants, Philadelphia Housing Authority, Mary Echols and Gregory A. Kern (hereinafter "PHA"), to Dismiss the Complaint is granted; the Complaint is dismissed without prejudice to the right of the plaintiffs to refile this case in state court or to refile the case in federal court after the state law issues have been resolved.

*Ayers,* 716 F.Supp. at 861.

Because we have held that the federal regulations preempt Acts 6 and 91, it is clear that a preliminary injunction should not have issued. To grant a preliminary injunction, the moving party must demonstrate, among other things, a reasonable probability that it will succeed in the litigation.[23] In light of our preemption holding, there is no probability, indeed, not even a possibility, that Ayers could have succeed-

---

**21.** In addition to ordering abstention based on *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), an order which we vacate, the district court also determined that "abstention is also proper in the present case under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)", see *Ayers v. PHA,* 716 F.Supp. 855, 859 (E.D.Penn. 1989). We cannot agree.

A central aspect of *Younger* abstention requires that "the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government" *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 11, 107 S.Ct. 1519, 1526, 95 L.Ed.2d 1 (1987). As we have pointed out, whatever the state's interest may be in regulating proceedings which result in removal of citizens from their homes, it cannot supersede the relevant federal interests in governing the expenditure of federal funds for the instant HUD housing programs. The district court, in finding that the *Younger* abstention requisites were met, did so only by reference to those considerations which we have held have been preempted by federal law.

We, on the other hand, are satisfied that the state interests identified here are not so important as would jeopardize the comity between the Commonwealth of Pennsylvania and the National Government if federal judicial power was exercised. Indeed, even Ayers concedes in its

opening brief that the case at bar does not implicate an important state interest (Ayers br. p. 30).

**22.** The record reveals a motion by Ayers' counsel for a preliminary injunction on behalf of "named plaintiff Sadie Noland and on behalf of the class" (Appendix 72). The record does not reveal a motion for a preliminary injunction having been made by Noland herself, nor does the record reveal any complaint which names Noland as a plaintiff. Thus we are at a loss to understand the reference in the preliminary injunction to "named plaintiff Sadie Noland" as a plaintiff. We can only assume that Noland was intended to be a class plaintiff, but the district court did not certify a class in light of its abstention ruling. Our holding is not affected by Noland's status.

**23.** This court has held that:

To obtain a preliminary injunction, the moving party must show (1) a reasonable probability of eventual success in the litigation, and (2) that irreparable injury will ensue if relief is not granted. In addition, the court may consider (3) the possibility of harm to other interested persons from the grant or denial of relief, and (4) the public interest. *Kennecott Corp. v. Smith,* 637 F.2d 181, 187 (3d Cir.1980).

ed in enjoining the PHA from evicting Ayers or from failing to comply with Acts 6 and 91. Accordingly, although we do so on a different ground, we affirm the district court's denial of Ayers' motion for a preliminary injunction.[24] However, because the district court on abstention grounds dismissed Ayers' complaint without prejudice and permitted Ayers to refile either in state or federal court, we are unable to affirm that order of dismissal. Our holding, absent any permitted amendments to Ayers' complaint which would state a federal cause of action (see section IV, *supra*), requires that Ayers' complaint be dismissed with prejudice and without the abstention qualifications that are provided in the district court order of June 27, 1989.

### C.

We therefore affirm the district court's order denying a preliminary injunction but vacate so much of the district court's order of June 27, 1989 which dismissed Ayers' complaint without prejudice and with certain abstention qualifications. We will remand to the district court to permit, if Ayers desires, an amendment of the complaint to state an independent federal cause of action if such an amendment is feasible and consistent with our discussion in this opinion. Failing such an amendment, we direct that on remand the district court correct that portion of its June 27, 1989 order to provide that Ayers' complaint be dismissed with prejudice.

### APPENDIX A

Relevant sections of Pennsylvania Act 6 (41 Pa.C.S.A. § 101 *et seq.*) and Pennsylvania Act 91 (35 Pa.C.S.A. § 1680.401C *et seq.*) are as follows:

Pennsylvania Act 6 (41 Pa.C.S.A. § 101 *et seq.*)

*§ 403. Notice of intention to foreclose*

(a) Before any residential mortgage lender may accelerate the maturity of any residential mortgage obligation, commence any legal action including mortgage foreclosure to recover under such obligation, or take possession of any security of the residential mortgage debtor for such residential mortgage obligation, such person shall give the residential mortgage debtor notice of such intention at least thirty days in advance as provided in this section.

(b) Notice of intention to take action as specified in subsection (a) of this section shall be in writing, sent to the residential mortgage debtor by registered or certified mail at his last known address and, if different, at the residence which is the subject of the residential mortgage.

(c) The written notice shall clearly and conspicuously state:

(1) The particular obligation or real estate security interest;

(2) The nature of the default claimed;

(3) The right of the debtor to cure the default as provided in section 404 of this act and exactly what performance including what sum of money, if any, must be tendered to cure the default;

(4) The time within which the debtor must cure the default;

(5) The method or methods by which the debtor's ownership or possession of the real estate may be terminated; and

(6) The right of the debtor, if any, to transfer the real estate to another person subject to the security interest or to refinance the obligation and of the transferee's right, if any, to cure the default.

(d) The notice of intention to foreclose provided in this section shall not be required where the residential mortgage debtor, has abandoned or voluntarily surrendered the property which is the subject of a residential mortgage.

*§ 404. Right to cure a default*

(a) Notwithstanding the provisions of any other law, after a notice of intention to foreclose has been given pursuant to section 403 of this act, at any time at least one hour prior to the commencement of bidding at a sheriff sale or other judicial sale on a residential mortgage obligation, the resi-

---

**24.** See *PAAC v. Rizzo,* 502 F.2d 306, 308 n. 1 (3d Cir.1974).

dential mortgage debtor or anyone in his behalf, not more than three times in any calendar year, may cure his default and prevent sale or other disposition of the real estate and avoid acceleration, if any, by tendering the amount or performance specified in subsection (b) of this section.

(b) To cure a default under this section, a residential mortgage debtor shall:

(1) Pay or tender in the form of cash, cashier's check or certified check, all sums which would have been due at the time of payment or tender in the absence of default and the exercise of an acceleration clause, if any;

(2) Perform any other obligation which he would have been bound to perform in the absence of default or the exercise of an acceleration clause, if any;

(3) Pay or tender any reasonable fees allowed under section 406 and the reasonable costs of proceeding to foreclosure as specified in writing by the residential mortgage lender actually incurred to the date of payment.

(4) Pay any reasonable late penalty, if provided for in the security document.

(c) Cure of a default pursuant to this section restores the residential mortgage debtor to the same position as if the default had not occurred.

## Pennsylvania Act 91

### (35 Pa.C.S.A. § 1680.401C *et seq.*).

### § 1680.402C. Notice and institution of foreclosure proceedings

(a) Before any mortgagee may accelerate the maturity of any mortgage obligation covered under this article, commence any legal action including mortgage foreclosure to recover under such obligation, or take possession of any security of the mortgage debtor for such mortgage obligation, such mortgagee shall give the mortgagor notice as described in section 403–C. Such notice shall be given in a form and manner prescribed by the agency. Further, no mortgagee may enter judgment by confession pursuant to a note accompanying a mortgage, and may not pro-

ceed to enforce such obligation pursuant to applicable rules of civil procedure without giving the notice provided for in this subsection and following the procedures provided for under this article.

(b) A mortgagee shall not accelerate the maturity of any mortgage obligation covered under this article, commence any legal action including mortgage foreclosure to recover under such obligation, or take possession of any security of the mortgage debtor for such mortgage obligation until a determination has been made on a mortgagor's application for emergency mortgage assistance payments or the applicable time periods provided for in section 403–C have expired, whichever is earlier.

(c) All pending legal actions by mortgagees on mortgages covered under this article in which sheriff's sales have not been consummated on the effective date of this article shall be temporarily stayed. The notice provided in section 403–C shall be given to all mortgagors against whom such legal actions are pending on the effective date of this article. Such stay shall extend until the applicable time limits provided for in section 403–C have expired or a mortgagor's request for assistance has been denied by the agency, whichever is earlier.

### § 1680.403C. Notice requirements

(a) Any mortgagee who desires to foreclose upon a mortgage shall send to such mortgagor at this or her last known address the notice provided in subsection (b): Provided, however, That such mortgagor shall be at least sixty (60) days contractually delinquent in his mortgage payments or be in violation of any other provision of such mortgage.

(b) The agency shall prepare a uniform notice for purposes of this section as follows: The notice shall list consumer credit counseling agencies and shall advise the mortgagor of his delinquency or other default under the mortgage and that such mortgagor has thirty (30) days to have a face-to-face meeting with the mortgagee who sent the notice or a consumer credit counseling agency to attempt to resolve the delinquency or default by restructuring the loan payment schedule or otherwise. The

notice shall be promulgated as part of the program guidelines required by section 401–C(b). If the mortgagor meets with a consumer credit counseling agency, the consumer credit counseling agency shall promptly notify all of the mortgagees secured by the mortgagor's real property, and no mortgagee so notified shall commence any legal action against the mortgagor's real property for a period not to exceed thirty (30) calendar days from the date that the mortgagor first meets with the consumer credit counseling agency. The notice shall include a statement that, if the mortgagor is unable to resolve the delinquency or default within thirty (30) calendar days of the mortgagor's first contact with either the mortgagee or a consumer credit counseling agency, the mortgagor may apply to the agency or its duly authorized agent at the address and phone number listed in the notice in order to obtain an application and information regarding the Homeowner's Emergency Mortgage Assistance Program. If the mortgagor applies for mortgage assistance payments, the agency shall promptly notify all of the mortgagees secured by the mortgagor's real property. The agency shall make a determination of eligibility within sixty (60) calendar days of receipt of the mortgagor's application. During the time that the application is pending, no mortgagee may commence legal action to foreclose upon its mortgage with the mortgagor.

(c) If the mortgagor fails to meet with the mortgagee or consumer credit counseling agency or meet any of the time limitations specified in the notice or if the mortgagor's application for mortgage assistance payments is denied, the mortgagee may, at any time thereafter, take any legal action to enforce the mortgage without any further restriction or requirements under this article. Financial institutions shall not be the duly authorized agents of the agency for the purpose of making any decision on the approval of assistance under this act.

(d) If, after a face-to-face meeting, the mortgagor and the mortgagee reach an agreement to resolve the delinquency or default as provided for in section 403–C(b) and if, because of circumstances beyond the mortgagor's control, the mortgagor is unable to fulfill the obligations of that agreement, the mortgagor may apply to the agency or its duly authorized agent for assistance under this article within thirty (30) days of any default in payment under the agreement previously reached. The mortgagee shall not be required to send any additional notice pursuant to this article.

(e) All parties requiring notice pursuant to this article shall be deemed to receive notice on the third business day following the date of the mailing of the notice as documented by a certificate of mailing obtained from the United States Postal Service.

## APPENDIX B

The relevant provisions of HUD's regulations governing Turnkey III housing is as follows:

### 24 C.F.R. § 901 *et seq.*

§ 904.104 Eligibility and selection of homebuyers.

(b) Eligibility and standards for admission

(b)(1) Homebuyers shall be low-income families as determined in accordance with the income definitions and limits established by the LHA and approved by HUD (see paragraph (b)(2) of this section). The HUD-approved standards for admission to low-rent housing, including the LHA's established priorities and preferences and the requirements for administration of low-rent housing under Title VI of the Civil Rights Act of 1964 (Pub.L. 88–352, 78 Stat. 241, 42 U.S.C. § 2000d), shall be applicable except that the procedures used for homebuyer selection under Turnkey III shall be those set forth in this section. In carrying out these procedures the aim shall be to provide for equal housing opportunity in such a way as to prevent segregation or other discrimination on the basis of race, creed,

color or national origin in accordance with the Civil Rights Act of 1964

§ 904.105  Counseling of homebuyers.

The LHA shall provide counseling and training as provided in Subpart C of this part, with funding as provided in § 904.206 of this part.  Applicants for admission shall be advised of the nature of the counseling and training program available to them and the application for admission shall include a statement that the family agrees to participate and cooperate fully in all official pre-occupancy and post-occupancy training and counseling activities.  Failure to participate as agreed may result in the family not being selected or retained as a homebuyer.

§ 904.107  Responsibilities of Homebuyer.

(m) Termination by LHA.  (1) If the homebuyer breaches the Homebuyers Ownership Opportunity Agreement by failure to make the required monthly payment within 10 days after its due date, by misrepresenting or withholding information (including the failure to meet the disclosure and verification requirements for Social Security Numbers, as provided by 24 CFR part 750) in applying for admission or in connection with any subsequent reexamination of income and family composition, or by failure to comply with any of the other homebuyer obligations under the Agreement, the LHA may terminate the Agreement.  No termination under this paragraph may occur less than 30 days after the LHA gives the homebuyer notice of its intent to do so in accordance with paragraph (m)(3) of this section.

(m)(2) Notice of termination by the LHA shall be in writing.  Such notice shall state (i) the reason for termination, (ii) that the homebuyer may respond to the LHA, in writing or in person, within a specified reasonable period of time regarding the reason for termination, (iii) that in such response he may be represented or accompanied by a person of his choice, including a representative of the HBA, (iv) that the LHA will consult the HBA concerning this termination, and (v) that unless the LHA rescinds or modifies the notice, the termi-

nation shall be effective at the end of the 30–day notice period.

(n) Termination by the homebuyer The homebuyer may terminate the Homebuyers Ownership Opportunity Agreement by giving the LHA 30 days notice in writing of this intention to terminate and vacate the home.  In the event that the homebuyer vacates the home without notice to the LHA, the Agreement shall be terminated automatically and the LHA may dispose of, in any manner deemed suitable by it, any items of personal property left by the homebuyer in the home.

(o) Transfer to rental unit

(o)(1) Inasmuch as the homebuyer was found eligible for admission to the Project on the basis of having the necessary elements of potential for homeownership, continuation of eligibility requires continuation of this potential, subject only to temporary unforeseen changes in circumstances.  Accordingly, in the event it should develop that the homebuyer no longer meets one or more of these elements of homeownership potential, the LHA shall investigate the circumstances and provide such counseling and assistance as may be feasible in order to help the family overcome the deficiency as promptly as possible.  After a reasonable time, not to exceed 30 days from the date of evaluation of the results of the investigation, the LHA shall make a reevaluation as to whether the family has regained the potential for homeownership or is likely to do so within a further reasonable time, not to exceed 30 days from the date of the reevaluation.  Further extension of time may be granted in exceptional cases, but in any event, a final determination shall be made no later than 90 days from the date of evaluation of the results of the initial investigation.  The LHA shall invite the HBA to participate in all investigations and evaluations.

(o)(2) If the final determination of the LHA, after considering the views of the HBA, is that the homebuyer should be transferred to a suitable dwelling unit in an LHA rental project, the LHA shall give the homebuyer written notice of the LHA determination of the loss of homeownership

potential and of the offer of transfer to a rental unit. The notice shall state that the transfer shall occur as soon as a suitable rental unit is available for occupancy, but no earlier than 30 days from the date of the notice, provided that an eligible successor for the homebuyer unit has been selected by the LHA. The notice shall also state that if the homebuyer should refuse to move under such circumstances, the family may be required to vacate the homebuyer unit, without further notice. The notice shall include a statement (i) that the homebuyer may respond to the LHA in writing or in person, within a specified reasonable time, regarding the reason for the determination and offer of transfer, (ii) that in such response he may be represented or accompanied by a person of his choice including a representative of the HBA, and (iii) that the LHA has consulted the HBA concerning this determination and offer of transfer.

§ 904.113 Achievement of ownership by initial homebuyer.

\* \* \* \* \* \*

(c) Methods of purchase

(c)(1) The homebuyer may achieve ownership when the amount in his EHPA, plus such portion of the NRMR as he wishes to use for the purchase, is equal to the purchase price as shown at that time on his Purchase Price Schedule plus all Incidental Costs (Incidental Costs mean the costs incidental to acquiring ownership, including, but not limited to, the costs for a credit report, field survey, title examination, title insurance, and inspections, the fees for attorneys other than the LHA's attorney, mortgage application and organization, closing and recording, and the transfer taxes and loan discount payment, if any). If for any reason title to the home is not conveyed to the homebuyer during the month in which such circumstances occur, the purchase price shall be fixed at the amount specified for such month and the homebuyer shall be refunded (i) the net additions, if any, credited to his EHPA subsequent to such month, and (ii) such part of the monthly payments made by the homebuyer after the purchase price has been fixed which exceeds the sum of the break-even amount attributable to the unit and the interest portion of the debt service shown in the Purchase Price Schedule.

§ 904.121 Use of appendices.

Use of the following Appendices is mandatory for Projects developed under this subpart: