554 A.2d 886

**Bertha BENNETT and Alton Porter, On Behalf of Themselves and All Others Similarly Situated, Appellees,**

**v.**

**Edwin SEAVE, Individually and in His Capacity as President of Mid–Penn Consumer Discount Co., and Mid–Penn Consumer Discount Co., Appellants.**

Supreme Court of Pennsylvania.

Argued Dec. 8, 1987.

Decided Feb. 15, 1989.

432

Curtis P. Cheyney, III, Philadelphia, for Edwin Seave.

Joseph M. Gindhart, Philadelphia, for Mid–Penn.

Eric Frank, Alan M. White, Philadelphia, for appellee.

## OPINION ANNOUNCING THE JUDGMENT
## OF THE COURT

ZAPPALA, Justice.

The issue presented in this appeal is whether the notice provisions of the Loan Interest and Protection Law (Act 6), 41 P.S. § 101 et seq., and the Homeowner's Emergency Assistance Act (Act 91), 35 P.S. § 1680.401c et seq., are applicable to legal actions to collect on a consumer loan secured both by the debtor's personalty and a mortgage when recovery is limited to execution on the personalty. Act 6 relates to the foreclosure of residential mortgages, and Act 91 deals with state-funded emergency assistance to homeowners who are facing foreclosure on their mortgages. We hold that the notice provisions established by Act 6 and Act 91 governing mortgage foreclosure actions are inapplicable to those legal actions and reverse the per curiam order of the Superior Court.

Appellees Bertha Bennett and Alton Porter initiated a class action in equity in the Philadelphia County Court of Common Pleas against the Appellants, Mid–Penn Consumer Discount Co. and its president Edwin Seave, seeking mone-

tary damages and injunctive relief for alleged violations of Act 6 and Act 91 in connection with legal proceedings brought by the Appellants to recover funds which had been loaned to the Appellees. The trial court subsequently entered an order denying the Appellees' motion for a preliminary injunction and granting the Appellants' motion for judgment on the pleadings. In a per curiam order, the Superior Court reversed the trial court and remanded the matter for further proceedings.

The equity complaint sought to define the class as "all persons who will enter or who have entered with Mid–Penn into 'residential mortgage' obligations within the meaning of Act 6 of 1974, 41 P.S. §§ 101 et seq. or 'mortgage' obligations within the meaning of Act 91 of 1983, as amended." Appellee Bertha Bennett, one of the named representatives of the purported class, borrowed money from Mid–Penn on September 2, 1983.[1] The installment loan transaction, which refinanced an outstanding debt owed to Mid–Penn and provided the Appellee with additional funds, was evidenced by a document stating that the loan was secured by a note and a mortgage. The document indicated that a security interest was being given in the Appellee's household goods and in her residential property. By the terms of the document, the appellee agreed to pay the sum of $3264.00 to Mid–Penn in 48 monthly installments of $68.00. This obligation was secured as well by a mortgage reflecting that amount, also stating the Appellee's obligation to repay the sum in monthly installments commencing on October 5, 1983. The mortgage was executed on September 2, 1983 also.

1. Leroy and Juanita McKinney were signatories to the note and were named as parties in the legal proceedings arising out of Mid–Penn's efforts to collect on the debt secured by the note. Although it is unclear from the note itself what the nature of the relationship was between the McKinneys and the other parties, the McKinneys' names follow therein after the word "Endorser". The McKinneys also signed a mortgage executed on the real estate involved in this appeal. The record indicates that Juanita McKinney is Ms. Bennett's daughter and resides at the house she shares with her husband, which is separately owned by the McKinneys.

434

On May 7, 1984, Mid–Penn sent a "Notice of Intention To Sue On Note And Accelerate Loan Balance" to Bertha Bennett. The notice stated, in relevant part:

*THIS IS A NOTICE OF DEFAULT AND OF OUR INTENT TO SUE ON YOUR NOTE. PLEASE READ ALL OF THIS NOTICE.*

1.  This company is the holder of a Note signed by you in connection with your loan with us.

2.  As of the date of this notice, *THE NOTE IS IN DEFAULT* because of nonpayment of the following monthly payments:

|  |  |
| --- | --- |
| April 5, 1984 | $ 68.00 |
| May 5, 1984 | $ 68.00 |
| TOTAL AMOUNT DUE | $136.00 |

3.  *YOU MAY CURE THIS DEFAULT WITHIN THIR-TY (30) DAYS OF THE DATE OF THIS LETTER, BY PAYING TO US THE ABOVE TOTAL AMOUNT DUE, PLUS ANY ADDITIONAL MONTHLY PAY-MENT WHICH MAY FALL DUE DURING THIS PE-RIOD.* Such payment must be made either by cash, cashier's check or money order, and made at our office.

4.  If you do not cure the default within *THIRTY (30) DAYS WE INTEND TO EXERCISE OUR RIGHT TO ACCELERATE THE LOAN BALANCE.* This means that whatever is owing on the original amount bor-rowed will be considered due immediately and you may lose the chance to pay off the original loan in monthly installments.

5.  If full payment of the amount of default is not made *WITHIN THIRTY (30) DAYS, WE ALSO INTEND TO INSTRUCT OUR ATTORNEYS TO START A LAW-SUIT.*

6.  If we refer your case to our attorneys, but you cure the default before they begin legal proceedings against you, you will still have to pay the reasonable attorney's fees, actually incurred, up to $50.00. However, if legal proceedings are started against you, you will have to

pay the reasonable attorney's fees even if they are over $50.00. Any attorney's fees will be added to whatever you owe us, which may also include our reasonable costs. *IF YOU CURE THE DEFAULT WITHIN THE THIRTY DAY PERIOD, YOU WILL NOT BE REQUIRED TO PAY ATTORNEY'S FEES.*

7. If you have not cured the default, and legal proceedings result in a Judgment, *WE MAY FILE A WRIT OF EXECUTION ON YOUR PERSONAL PROPERTY,* and if your account still remains in default *WE MAY INSTITUTE A SHERIFF SALE OF YOUR PERSONAL PROPERTY.*

8. Any payment received from you which is less than the amount necessary to *CURE THE DEFAULT* as required by this notice, will be credited to your account, but your account will remain in default and will not be reinstated until the account is current including reimbursement of all legal costs and fees incurred as set forth above.

9. If we institute legal proceedings as stated in paragraphs four (4), five (5), six (6), and seven (7) above, we will do so in order to recover sums due us from you, *SOLELY FROM THE SHERIFF SALE OF YOUR PERSONAL PROPERTY.*

\* \* \* \* \* \*

(Emphasis supplied.)

Mid–Penn subsequently brought an assumpsit action to collect the unpaid balance due on Bennett's loan, plus interest and the costs of suit. The complaint alleged that Mid–Penn was seeking to recover the amount due from all assets owned by the debtor other than the residential property.

Appellee Alton Porter, the other named representative of the purported class, borrowed $3,003.99 from Mid–Penn on February 12, 1982.[2] A promissory note was signed by the

---

2. The Appellee's son was a signatory to the promissory note and to the mortgage executed contemporaneously with the installment loan transaction.

Appellee in connection with the loan and a mortgage was executed on the residential property owned by the Appellee for the total amount of the loan, which included principal and interest. The loan document again indicated that the debt was secured by a mortgage and note. The Appellee's property securing the debt was further described as household contents and by reference to his residential property.

On July 16, 1984, Mid–Penn sent its notice of intention to sue on the note due to Porter's default by failing to make the $108.00 monthly payments for the two preceding months. The form of the notice was identical to that sent to Appellee Bennett. It does not appear from the record that any legal proceedings were initiated against Porter to collect the outstanding balance due on the loan.

The class action complaint filed by the Appellees alleged that Mid–Penn had improperly failed to comply with the notice requirements of Act 6 and Act 91. The complaint further alleged that Mid–Penn's practice of sending its form notice to debtors who have defaulted on their loan obligations was deceptive and a violation of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–3. Mid–Penn denied that the notice provisions of Act 6 and Act 91 are applicable to legal proceedings to collect on a promissory note executed in connection with a consumer loan when recovery is limited to personal property only. Mid–Penn later sought judgment on the pleadings in its favor.

Following an evidentiary hearing on the Appellees' motion for a preliminary injunction, the requested injunction was denied and Mid–Penn's motion for judgment on the pleadings was granted. The trial court specifically found that Mid–Penn had not provided the Appellees with the notices required under Act 6 and Act 91, but concluded that such notices are unnecessary when the legal proceedings undertaken to collect the unpaid balances on personal consumer loans are assumpsit actions on the note and do not involve mortgage foreclosure.

On appeal, the Superior Court entered a per curiam order reversing the trial court, 358 Pa.Super. 623, 514 A.2d 197.

In its memorandum opinion accompanying the order, the Superior Court stated that Mid–Penn would be precluded from instituting action against *any* assets of the debtors without compliance with the notice requirements of both Acts.

The relevant provision of the Loan Interest and Protection Law, Act 6, states:

(a) Before any residential mortgage lender may accelerate the maturity of any residential mortgage obligation, commence any legal action including mortgage foreclosure to recover under such obligation, or take possession of any security of the residential mortgage debtor for such residential mortgage obligation, such person shall give the residential mortgage debtor notice of such intention at least thirty days in advance as provided in this section.

(b) Notice of intention to take action as specified in subsection (a) of this section shall be in writing, sent to the residential mortgage debtor by registered or certified mail at his last known address and, if different, at the residence which is the subject of the residential mortgage.

(c) The written notice shall clearly and conspicuously state:

(1) The particular obligation or real estate security interest;

(2) The nature of the default claimed;

(3) The right of the debtor to cure the default as provided in section 404 of this act and exactly what performance including what sum of money, if any, must be tendered to cure the default;

(4) The time within which the debtor must cure the default;

(5) The method or methods by which the debtor's ownership or possession of the real estate may be terminated; and

(6) The right of the debtor, if any, to transfer the real estate to another person subject to the security interest

or to refinance the obligation and of the transferee's right, if any, to cure the default.[3]

The Homeowner's Emergency Assistance Act, Act 91, was enacted 1983 in response to the spiraling numbers of mortgage foreclosures due to the severe economic recession experienced in this Commonwealth. The purpose of the Act was to establish an emergency mortgage assistance program to prevent the widespread mortgage foreclosures on residential properties which had resulted from default caused by circumstances beyond the owners' control.

To insure that the emergency assistance made available under that program would not be made illusory by an owner's lack of awareness of the program's existence, Act 91 requires that notice of foreclosure proceedings be given to the homeowner to advise him of the program itself. The relevant notice provision requirement of the Act states:

(a) Before any mortgagee may accelerate the maturity of any mortgage obligation covered under this article, commence any legal action including mortgage foreclosure to recover under such obligation, or take possession of any security of the mortgage debtor for such mortgage obligation, such mortgage shall give the mortgagor notice as described in section 403–C. Such notice shall be given in a form and manner prescribed by the agency. Further, no mortgagee may enter judgment by confession pursuant to a note accompanying a mortgage, and may not proceed to enforce such obligation pursuant to applicable rules of civil procedure without giving the notice provided for in this subsection and following the procedures provided for under this article.

(b) A mortgagee shall not accelerate the maturity of any mortgage obligation covered under this article, commence any legal action including mortgage foreclosure to recover under such obligation, or take possession of any

---

**3.** "Residential mortgage lender" is defined as "... any person who lends money or extends or grants credit and obtains a residential mortgage to assure payment of the debt. The term shall also include the holder at any time of a residential mortgage obligation." 41 P.S. § 101.

security of the mortgage debtor for such mortgage obligation until a determination has been made on a mortgagor's application for emergency mortgage assistance payments or the applicable time periods provided for in section 403–C have expired, whichever is earlier.

(c) All pending legal actions by mortgagees on mortgages covered under this article in which sheriff's sales have not been consummated on the effective date of this article shall be temporarily stayed. The notice provided in section 403–C shall be given to all mortgagors against whom such legal actions are pending on the effective date of this article. Such stay shall extend until the applicable time limits provided for in section 403–C have expired or a mortgagor's request for assistance has been denied by the agency, whichever is earlier.

35 P.S. § 1680.402c.

The mortgagor notice requirements referred to as section 403–C are set forth in 35 P.S. § 1680.403c which provides:

(a) Any mortgagee who desires to foreclose upon a mortgage shall send to such mortgagor at his or her last known address the notice provided in subsection (b): Provided, however, That such mortgagor shall be at least sixty (60) days contractually delinquent in his mortgage payments or be in violation of any other provision of such mortgage.

(b) The agency shall prepare a uniform notice for purposes of this section as follows: The notice shall list consumer credit counseling agencies and shall advise the mortgagor of his delinquency or other default under the mortgage and that such mortgagor has thirty (30) days to have a face-to-face meeting with the mortgagee who sent the notice or a consumer credit counseling agency to attempt to resolve the delinquency or default by restructuring the loan payment schedule or otherwise. The notice shall be promulgated as part of the program guidelines required by section 401–C(b). If the mortgagor meets with a consumer credit counseling agency, the consumer credit counseling agency shall promptly notify

all of the mortgagees secured by the mortgagor's real property, and no mortgagee so notified shall commence any legal action against the mortgagor's real property for a period not to exceed thirty (30) calendar days from the date that the mortgagor first meets with the consumer credit counseling agency. The notice shall include a statement that, if the mortgagor is unable to resolve the delinquency or default within thirty (30) calendar days of the mortgagor's first contact with either the mortgagee or a consumer credit counseling agency, the mortgagor may apply to the agency or its duly authorized agent at the address and phone number listed in the notice in order to obtain an application and information regarding the Homeowner's Emergency Mortgage Assistance Program. If the mortgagor applies for mortgage assistance payments, the agency shall promptly notify all of the mortgagees secured by the mortgagor's real property. The agency shall make a determination of eligibility within sixty (60) calendar days of receipt of the mortgagor's application. During the time that the application is pending, no mortgagee may commence legal action to foreclose upon its mortgage with the mortgagor.

(c) If the mortgagor fails to meet with the mortgagee or consumer credit counseling agency or meet any of the time limitations specified in the notice or if the mortgagor's application for mortgage assistance payments is denied, the mortgagee may, at any time thereafter, take any legal action to enforce the mortgage without any further restriction or requirements under this article. Financial institutions shall not be the duly authorized agents of the agency for the purpose of making any decision on the approval of assistance under this act.

(d) If, after a face-to-face meeting, the mortgagor and the mortgagee reach an agreement to resolve the delinquency or default as provided for in section 403–C(b) and if, because of circumstances beyond the mortgagor's control, the mortgagor is unable to fulfill the obligations of that agreement, the mortgagor may apply to the agency or its duly authorized agent for assistance under this

article within thirty (30) days of any default in payment under the agreement previously reached. The mortgagee shall not be required to send any additional notice pursuant to this article.

(e) All parties requiring notice pursuant to this article shall be deemed to receive notice on the third business day following the date of the mailing of the notice as documented by a certificate of mailing obtained from the United States Postal Service.

As the Superior Court noted, because both Act 6 and Act 91 require that notice must be given before any legal action may be commenced to recover under a "mortgage obligation", the crucial inquiry becomes what is encompassed within the definition of a mortgage obligation.

Act 6 defines a "residential mortgage" to include:

an obligation to pay a sum of money in an original bona fide principal amount of fifty thousand dollars ($50,000) or less, *evidenced by a security document and secured by a lien upon real property located within this Commonwealth* containing two or fewer residential units or on which two or fewer residential units are to be constructed and shall include such an obligation on a residential condominium unit.

41 P.S. § 101 (Emphasis added). Act 91 defines the term "mortgage" for purposes of the act as "... any obligation *evidenced by a security document and secured by a lien upon real property located within the Commonwealth* including, but not limited to, a deed of trust and land sale agreement." 35 P.S. § 1680.401c(a) (Emphasis added).

While it is clear from the comparable definitions of mortgage that the mortgages executed by the Appellees are within the scope of the acts, it does not necessarily follow that the notice provisions are applicable to legal actions brought under a promissory note executed contemporaneously with the mortgage documents when recovery is limited to a separate security interest in personalty.[4] The debts

---

4. We agree with the observation of the U.S. Bankruptcy Court for the Eastern District of Pennsylvania in *In re Schwartz,* 68 B.R. 376 (1986)

assumed by the Appellees were secured both by granting a security interest in household goods and by executing a mortgage on residential property. The security interest in the household goods is not a "mortgage" under Act 6 or Act 91. By definition, a document creating a security interest in the household goods is excluded from the scope of the acts because it is not a lien upon real property.

The Appellees urge us to adopt the construction developed by the Superior Court that the notice requirements under the acts must be satisfied prior to any legal action to recover the debt because the term "obligation" refers not to the document of mortgage that secures the debt, but to the debt itself. Although we agree that "obligation" refers to the debt, we must reject the Superior Court's analysis that every security interest created in connection with a consumer loan transaction is a "mortgage obligation" for purposes of the Act simply because real property is pledged along with additional collateral to secure the underlying debt. This analysis collapses the two separate transactions—the one which pledges the personalty as security and the one which creates a lien upon real property. The mortgage documents executed by the Appellees are obligations "evidenced by a security document and secured by a lien upon real property". The notes which were also executed evidence the debt, but do not of themselves create a lien upon real property.

The purpose behind the notice provisions of both acts was not to require a lender to advise the borrower of an intention to accelerate the maturity of a residential mortgage obligation when the legal action initiated is not based upon the mortgage document. The comprehensive statutory scheme demonstrates an extensive program designed to avoid mortgage foreclosures. The mechanisms created thereunder to provide counseling and assistance to homeowners facing mortgage foreclosure would be superfluous

that the reference to other legal actions in Act 6 refers to the other forms of action a mortgagee may employ to enforce its rights under the mortgage and that regardless of the form utilized, the proceedings would have to be preceded by a notice of intention to foreclose.

in the context of an action to recover a debt by proceeding against a security interest in personalty. It would be an absurd result to trigger the assistance program under such circumstances. A borrower may pledge multiple forms of collateral to secure a debt—the protections afforded by Act 6 and Act 91 are statutorily limited to security extended by the execution of a residential mortgage. Personalty pledged separately as security for a debt is not afforded the protections of the notice provisions under those acts.

Accordingly, the order of the Superior Court is reversed.

NIX, C.J., and PAPADAKOS, J., file concurring opinions.

LARSEN, J., files a dissenting opinion.

NIX, Chief Justice, concurring opinion

I concur in the judgment reached by the majority today. The purpose of these two Acts is to protect the defaulting debtor in a foreclosure proceeding where the mortgagor seeks the recovery of the real property to satisfy the debt. The Acts were created to prevent the loss of one's home without proper notice and protections as provided by law. These Acts have no application, nor were they intended to apply, to security other than real estate. Since the obligation is secured by both the note and the mortgage, until execution is attempted on the mortgage the policies of the Acts are not applicable. The Acts do not follow the obligation but rather the security pledged for the obligation, which is the real estate.

PAPADAKOS, Justice, concurring.

While I concur in the judgment reached by the majority, I write separately to delineate my view that an issue which is closely related to that resolved in the instant case has not been decided and, indeed, must not be prejudiced by our narrow decision today.

Typically, a "mortgage" in modern times involves two closely related yet legally separate obligations. The bor-

rower will sign a "note" evidencing the duty to repay with interest the loan he receives. In Pennsylvania, the "note" has traditionally been in the form of two documents—the bond and the warrant of attorney. The borrower will also pledge real estate, or more properly, his interest or title in real estate, to the lender as security for the repayment of the loan. This second pledge agreement is the mortgage document itself, properly speaking. If the borrower defaults on his loan payments, the lender is entitled to have the real estate seized and sold at a judicial foreclosure sale in order to pay off the delinquent loan. This is what is commonly known as foreclosure, now governed by Pa.R. C.P. 1141–1150. Because of abuses and hardships occasioned by periods of high unemployment and downturns in the economy, our legislature passed, in recent years, Act 6 and Act 91. Both statutes are designed to protect hardpressed homeowners, that is, owners of residential real estate who fall behind in their mortgage payments. Both statutes impose extensive notice requirements on a lender who seeks to foreclose against residential real property.

The Act 6 notice is designed, in part, to give the borrower the opportunity to cure any defaults that may have occurred in the loan agreement and to take advantage of various consumer protection devices extended by the Act before his home is seized and sold by the sheriff. The Act 91 notice is designed to give a homeowner the chance to apply for a state loan to help pay off the mortgage in situations where the homeowner cannot meet his mortgage payments because of unemployment, before foreclosure occurs. Both statutes have been liberally applied to achieve the salutory public purposes they were designed to achieve.

Because of the fact that real estate loans usually involve both a note and the mortgage itself, a lender in Pennsylvania has never been limited (in his remedies against a delinquent borrower) solely to foreclosure against the real estate itself, or to a single action against the borrower. In addition to, or instead of foreclosure, the lender has always been free to sue the borrower directly in an action on the

note itself. Once a lender proceeds to judgment in this fashion, he is free to levy execution against *any* property owned by the judgment debtor, including the real estate that is also the subject of the mortgage. Until recently, a lender would forego suit on the note and, typically, would foreclose first. Often times, the delinquent borrower would have no other asset except his or her interest in the real estate, and proceeding directly to foreclosure would expedite the seizure and sale of that asset. The infrequency of suits directly on the note may be advanced as a plausible explanation for the failure of the court to make either Act 6 or Act 91 applicable to such suits *in hoc verba.*

It was common in former times for mortgage lenders to "confess judgment" on the note. This type of proceeding did not require prior notice to the borrower, and it constituted a cheap and expeditious alternative to foreclosure. It has fallen into disfavor in recent years because of constitutional infirmities and because Act 6 (passed in 1974) explicitly requires that before such a judgment can be used to seize and sell residential real property, the lender must commence and prosecute an entirely new (and potentially time-consuming) second proceeding against the borrower with appropriate prior notice and an opportunity to be heard. See, 41 P.S. § 407; Pa.R.C.P. 2981–2986. Gray, Pa. Mortgages, §§ 1–3, 3–9.

Unlike execution on a confessed judgment, Act 6 and Act 91 have never been held to require compliance with their notice and cure provisions when a lender proceeds to judgment after a straight forward action on the note and then seeks to levy against the residential real property that is the subject of the underlying mortgage. Our decision today, in my judgment, does not preclude such a possibility. In the instant case, the Appellant-lender took or threatened to take judgment on the note, but it was barred by its own loan agreement from executing on the real property. Hence, residential real estate was never threatened under these facts and we properly hold Act 6 and Act 91 to be

inapplicable here. In cases where residential real estate *may* be subject to later levy or execution after a judgment is entered in favor of the lender in an action on the note, however, our opinion today simply does not determine whether Act 6 and Act 91 then become applicable. There is a sound argument available to the effect that both statutes should come into play at that point. After all, a lender should not be permitted to do indirectly what it cannot do directly as a matter of overriding public policy.

I fully expect that in the coming years suits on the note will become more common in the mortgage situation in Pennsylvania. The Internal Revenue Code has recently been amended to make the interest on credit card loans deductible only if the loans are secured by an interest in real estate. The increase in loans secured by a mortgage on the consumer's home that this provision will produce may well accelerate such suits in Pennsylvania. Before the question arises in litigation, I suspect that the legislature ought to consider whether to amend Act 6 and Act 91 to apply expressly to executions on residential real property after judgment on the note has been obtained. Whether the legislature acts or not, however, I write to make it clear that in my view, our decision today does not prevent this Court, in the future, from applying Act 6 and Act 91, as currently written, to such situations. Subject to the above qualification, I concur in the decision of the majority.

LARSEN, Justice, dissenting.

I dissent and would affirm the order of Superior Court which reversed the trial court order granting appellants' motion for judgment on the pleadings. I agree with the Superior Court holding that Act 6 and Act 91 notices must precede *any* legal action to effect recovery under an obligation that is secured by a residential mortgage and, in support thereof, I adopt the attached memorandum opinion of the Superior Court.