**[J-67-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| JP MORGAN CHASE BANK N.A. (SUBSTITUTED PLAINTIFF, GREAT AJAX OPERATING PARTNERSHIP, LP), | : : : | No. 6 EAP 2018 |
| | : : | Appeal from the Order of Superior Court entered on 08/25/2017 at 470 |
| Appellee | : : | EDA 2016 affirming the Judgment entered on 02/22/2016 in the Court of |
| | : : | Common Pleas, Philadelphia County, |
| v. | : : | Civil Division at No. 03473 July Term 2013. |
| | : | |
| KENNETH J. TAGGART, | : : | ARGUED: September 26, 2018 |
| | : | |
| Appellant | : | |

**OPINION**

**JUSTICE WECHT**                               **DECIDED: February 20, 2019**

Kenneth J. Taggart ("Taggart") appeals from the order of the Superior Court, which

affirmed the trial court's verdict in mortgage foreclosure in favor of Great Ajax Operating

Partnership ("Great Ajax"). We conclude that Great Ajax or its predecessors failed to

provide pre-foreclosure notice before initiating a second mortgage foreclosure action as

required by the Loan Interest and Protection Law, 41 P.S. §§ 101-605 ("Act 6"). In

reaching this conclusion, we hold that the purposes of Act 6 are served by requiring each

action in mortgage foreclosure to be preceded by a separate pre-foreclosure notice. A

lender may not recycle a stale pre-foreclosure notice that it issued in connection with a

prior complaint in mortgage foreclosure. Because Great Ajax failed to provide a separate pre-foreclosure notice before initiating the second action, we reverse the Superior Court.

On July 20, 2005, Taggart borrowed $120,000 from Chase Bank USA "(Chase Bank"). The loan was secured by an adjustable rate note ("Note") and a mortgage ("Mortgage") upon real property in Philadelphia ("the Property"), pursuant to which Taggart pledged the Property as collateral. Taggart later defaulted on the Note by failing to make a timely payment in March 2009 and each month thereafter.

On April 22, 2010, Chase Bank issued a combined pre-foreclosure notice ("Notice") to Taggart pursuant to Act 6 and the Homeowner's Emergency Mortgage Assistance Act of 1983, 35 P.S. §§ 1680.401c-1680.412c ("Act 91"). Act 6 relates to the foreclosure of residential mortgages, and Act 91 deals with state-funded emergency assistance to residential homeowners who are facing mortgage foreclosure.[1] Both

---

[1]     This Court has explained the purpose of Act 91 as follows:

> The Homeowner's Emergency Assistance Act, Act 91, was enacted [in] 1983 in response to the spiraling numbers of mortgage foreclosures due to the severe economic recession experienced in this Commonwealth. The purpose of the Act was to establish an emergency mortgage assistance program to prevent the widespread mortgage foreclosures on residential properties which had resulted from default caused by circumstances beyond the owners' control.

> To insure that the emergency assistance made available under that program would not be made illusory by an owner's lack of awareness of the program's existence, Act 91 requires that notice of foreclosure proceedings be given to the homeowner to advise him of the program itself.

*Bennett v. Seave*, 554 A.2d 886, 889 (Pa. 1989). Like Act 6, Act 91 requires notice prior to the initiation of an action in mortgage foreclosure:

> (a) Before any mortgagee may accelerate the maturity of any mortgage obligation covered under this article, commence any legal action including

statutes require a residential mortgage holder to provide notice to the borrower of the holder's intent to foreclose. To satisfy this obligation for loans that are covered by both Act 6 and Act 91, lenders issue a combined notice to borrowers to comply with both statutes. Indeed, where both acts apply, the Pennsylvania Housing Finance Agency has created a notice intended to comply with both statutes, which "shall be in lieu of any other notice required by law." 35 P.S. § 1680.403c(b)(1).

Here, the parties agree that Act 91 does not apply, because the Property is not Taggart's principal residence. *See* 35 P.S. § 1680.401c(a) (providing that Act 91 does not apply if "[t]he property securing the mortgage is not the principal residence of the mortgagor"). Nor do the parties dispute that Act 6 applies.[2] In relevant part, Section 403 of Act 6 requires pre-foreclosure notice as follows:

> (a) Before any residential mortgage lender may accelerate the maturity of any residential mortgage obligation, commence any legal action including mortgage foreclosure to recover under such obligation, or take possession of any security of the residential mortgage debtor for such residential mortgage obligation, such person shall give the residential mortgage debtor notice of such intention at least thirty days in advance as provided in this section.

> (b) Notice of intention to take action as specified in subsection (a) of this section shall be in writing, sent to the residential mortgage debtor by registered or certified mail at his last known address and, if different, at the residence which is the subject of the residential mortgage.

> (c) The written notice shall clearly and conspicuously state:

---

> mortgage foreclosure to recover under such obligation, or take possession of any security of the mortgage debtor for such mortgage obligation, such mortgagee shall give the mortgagor notice as described in section 403-C.

35 P.S. § 1680.402c(a).

[2]     Although it is not clear why Chase Bank issued a combined notice to Taggart, we will confine our analysis to Act 6 and delve into Act 91 only when necessary to provide context or to confront the parties' arguments.

(1) The particular obligation or real estate security interest;

(2) The nature of the default claimed;

(3) The right of the debtor to cure the default as provided in section 404 of this act and exactly what performance including what sum of money, if any, must be tendered to cure the default;

(4) The time within which the debtor must cure the default;

(5) The method or methods by which the debtor's ownership or possession of the real estate may be terminated; and

(6) The right of the debtor, if any, to transfer the real estate to another person subject to the security interest or to refinance the obligation and of the transferee's right, if any, to cure the default.

(d) The notice of intention to foreclose provided in this section shall not be required where the residential mortgage debtor[ ] has abandoned or voluntarily surrendered the property which is the subject of a residential mortgage.

41 P.S. § 403.

The April 22, 2010 Notice, entitled "Act 91 Notice Take Action to Save Your Home from Foreclosure," explained that Taggart had defaulted on his loan and that Chase Bank intended to foreclose; it also specified the nature of the default. *See* Complaint, Ex. B. The Notice informed Taggart that the mortgage was in default because Taggart had failed to make payments from March 1, 2009, through April 21, 2010, and that the way to cure the default was to "bring it up to date." *Id.* The Notice identified the sum of the monthly payments that were past due, the accrued late charges and fees, and the amount Taggart would have to pay to cure the default:

Total Monthly Payments Past Due: $14911.78
Late Charges: $687.61
Other Fees: $250
TOTAL AMOUNT DUE TO CURE THE DEFAULT: $15849.39

*Id.*

The Notice instructed Taggart to cure the default within thirty days by paying the total amount due to Chase Bank. To effectuate payment, Chase Bank provided two of its addresses, one for regular mail and one for overnight mail. The Notice explained that the consequence of non-payment would be a mortgage foreclosure action. Finally, the Notice instructed Taggart how to contact Chase Bank by phone, fax, mail, or email. *Id.*

Taggart failed to cure the default. On September 2, 2010, Chase Bank filed a complaint in mortgage foreclosure against Taggart (the "2010 Action") seeking $133,695.24 in damages. The complaint averred that the lender had provided the requisite Act 6 notice, and it attached the April 22, 2010 Notice.

Taggart filed preliminary objections to the 2010 Action. Chase Bank failed to file a timely response. On February 3, 2011, the trial court sustained Taggart's preliminary objections and dismissed the complaint. On March 8, 2012, Chase Bank assigned the rights and interest in the mortgage to JP Morgan Chase Bank ("JP Morgan"). Neither Chase Bank nor JP Morgan took further action on the docketed complaint. On May 1, 2013, the docket was closed administratively due to inactivity exceeding twenty-four months.

On July 26, 2013, JP Morgan filed a second complaint in mortgage foreclosure against Taggart, under a new docket number, claiming that $164,887.53 was due on the Mortgage as of April 9, 2013 (the "2013 Action"). JP Morgan did not send a new Act 6 notice. Instead, the complaint averred that Taggart had received the requisite Act 6 notice, and appended the April 22, 2010 Notice as an exhibit to substantiate this assertion.

During the pendency of this litigation, the rights and interest in the Mortgage were assigned three more times, the last of which was to Great Ajax on February 23, 2015. Also on that date, the trial court permitted Great Ajax to be substituted as plaintiff. On May 27 and 28, 2015, the trial court held a bench trial. On November 25, 2015, the trial court rendered a verdict in favor of Great Ajax. Judgment was entered on December 7, 2015, and, on January 6, 2016, the trial court denied post-trial motions.

Throughout the litigation, Taggart argued that he was not provided the requisite pre-foreclosure notice in connection with the pending foreclosure action. Taggart challenged JP Morgan's and Great Ajax's reliance upon the Notice because that Notice was sent in anticipation of the 2010 Action, which had been dismissed. Following entry of judgment, Taggart filed a notice of appeal, asserting, *inter alia,* that the Notice was invalid and insufficient to support the initiation of the 2013 Action. In its responsive opinion, the trial court rejected this claim, apparently upon the mistaken belief that the 2013 Action was a continuation of the 2010 Action and upon its misperception of Taggart's argument, which the trial court believed to be that Great Ajax was required to send a new Act 6 notice when it was substituted as plaintiff in 2015.

The Superior Court affirmed the entry of judgment in mortgage foreclosure against Taggart. *JP Morgan Chase Bank, N.A. (Substituted Plaintiff, Great Ajax Operating P'ship, LP) v. Taggart*, 470 EDA 2016, 2017 WL 3669502 (Pa. Super. Aug. 25, 2017). Before the Superior Court, Taggart argued that, because the 2010 Action was dismissed, JP Morgan was required to send a new Act 6 notice at least thirty days prior to filing the 2013 Action. The Superior Court disagreed, and held that nothing required JP Morgan to send a new Act 6 notice prior to commencing the 2013 Action. The court acknowledged its

decision in *Wells Fargo Bank, N.A. v. Spivak*, 104 A.3d 7 (Pa. Super. 2014), which held that a lender who voluntarily withdraws an action in mortgage foreclosure must issue a new Act 6 notice before filing a new action in mortgage foreclosure. However, according to the court, *Spivak* did not control, because the lender in this case did not voluntarily withdraw the 2010 Action.

This Court granted Taggart's petition for allowance of appeal in order to resolve "[w]hether a lender/mortgagee whose first complaint in mortgage foreclosure against a borrower/mortgagor was dismissed is required to send a new Notice of Intention to Foreclose pursuant to 41 P.S. § 403(a) (Act 6 Notice) prior to filing a second complaint in mortgage foreclosure." *JP Morgan Chase Bank, N.A. (Substituted Plaintiff, Great Ajax Operating P'ship, LP) v. Taggart*, 180 A.3d 367 (Pa. 2018) (*per curiam*). Because this issue raises a question of law, our standard of review is *de novo*, and our scope of review is plenary. *Roethlein v. Portnoff Law Assoc.*, 81 A.3d 816, 820 (Pa. 2013).

The question of a lender's obligation to send a new Act 6 notice prior to filing a second complaint, in a circumstance where the first complaint was dismissed, is a matter of statutory construction. Pursuant to the Statutory Construction Act, the object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. 1 Pa.C.S. § 1921(a). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.* § 1921(b). When the words of a statute are not explicit, the Court must endeavor to ascertain the General Assembly's intent by considering matters other than

the statutory language. *Id.* § 1921(c).[3] The Court also must read the sections of a statute together and construe them so as to give effect to all of the statute's provisions. *Id.* § 1921(a). Finally, statutes "*in pari materia* shall be construed together, if possible, as one statute." *Id.* § 1932(a). "Statutes or parts of statutes are *in pari materia* when they relate to the same persons or things." *Id.* § 1932(b).

Taggart argues that the plain language of Act 6, Section 403(c), requires the lender to provide the borrower with the requisite notice prior to initiating "any" action in mortgage foreclosure, without restriction. Because the 2013 action was a new and discrete action in mortgage foreclosure, Taggart would have us hold that the lender was required to issue a new Act 6 notice rather than recycle the old notice from a prior action.

Looking beyond the plain language, Taggart relies upon the purpose of Act 6, which, he asserts, aims to provide a borrower with notice and opportunity to cure a default

---

[3]     Such matters include the following:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921(c).

before a foreclosure action is initiated. According to Taggart, this purpose would be disserved by waiving the requirement of Act 6 notice when the lender provided notice in connection with a prior, dismissed complaint in mortgage foreclosure. Finally, Taggart notes that the Superior Court's analysis in this case is inconsistent with that court's analysis in *Spivak*, which he urges this Court to adopt.[4]

In response, Great Ajax (as substituted plaintiff) defends JP Morgan's failure to issue an Act 6 notice in connection with the second complaint by arguing that Section 403 does not, by its terms, require a lender to send multiple pre-foreclosure notices, particularly where a prior action was dismissed on preliminary objections. Urging this Court to construe Act 6 and Act 91 *in pari materia*, Great Ajax observes that Act 91 expressly provides that, after the lender provides pre-foreclosure notice, the lender need not provide any additional notice. *See* 35 P.S. §§ 1680.403c(d), (g).[5] Great Ajax notes that the Commonwealth Court has construed Act 91 not to require a second pre-

---

[4] Several organizations jointly have filed an *amicus curiae* brief in support of Taggart: The Pennsylvania Legal Aid Network, Inc., Community Legal Services, Inc., Philadelphia Legal Assistance, Community Justice Project, and Neighborhood Legal Services Association. *Amici* urge this Court to adopt the Superior Court's plain language analysis of Act 6 in *Spivak*, and, alternatively, to adopt their position invoking the canons of statutory construction.

[5] Section 403-C(d) of Act 91 provides that "[t]he mortgagee shall not be required to send any additional notice pursuant to this article" where the lender and the borrower have had a "face-to-face meeting," reached an agreement to resolve the default, and the borrower becomes unable to comply with the agreement. 35 P.S. § 1680.403c(d).

Section 403-C(g) of Act 91 provides that "a mortgagee shall not be required to send the uniform notice . . . to any mortgagor who has already been sent the uniform notice and" has not applied for a mortgage assistance loan, has applied for a mortgage assistance loan and was denied, or whose mortgage assistance disbursements were terminated for any reason. *Id.* § 1680.403c(g).

foreclosure notice after an earlier foreclosure action was withdrawn. *See Fish v. Pa. Housing Fin. Agency*, 931 A.2d 764 (Pa. Cmwlth. 2007).

Great Ajax further argues that the amount necessary to cure a mortgage default fluctuates daily, making it unreasonable to construe Act 6 to require notice prior to each and every foreclosure action. Finally, like the Superior Court, Great Ajax distinguishes *Spivak* by arguing that there is a difference for Act 6 purposes between a prior action that is discontinued and one that is dismissed. According to Great Ajax, in the first scenario, the Act 6 notice effectively is withdrawn, while, in the second scenario, dismissal of the action does not also dismiss the Act 6 notice.

We begin, as we must, with the statutory language. Section 403 of Act 6 requires a lender to provide pre-foreclosure notice at least thirty days before "accelerat[ing] the maturity of any residential mortgage obligation, commenc[ing] *any legal action including mortgage foreclosure* to recover under such obligation, or tak[ing] possession of any security of the residential mortgage debtor for such residential mortgage obligation." 41 P.S. § 403(a) (emphasis added). By its terms, the statutory notice is mandatory and must be provided at least thirty days before the lender institutes "any" legal action, including foreclosure.

The parties present this Court with differing interpretations of this requirement. Taggart asserts that "any" means "each and every." Great Ajax would have us hold that "any," in this context, indicates merely the kind or type of action for which the pre-foreclosure notice is required, such that a prior Act 6 notice, issued once and at any time in connection with a prior complaint in mortgage foreclosure, satisfies this requirement.

Each party's plain language interpretation is reasonable. The short yet opaque word "any" persistently creates statutory ambiguity. As one prominent commentator astutely has explained, "any," when used as an adjective, is susceptible to no fewer than six meanings:

(1) The most common occurrence is in conditional, hypothetical, and interrogative sentences, where *any* means "a (no matter which)" or "some" <If you have any salt, I'd like to borrow some> <If any problem were to arise, what would it likely be?> <Is there any evidence of the crime?>. (2) In negative assertions, it creates an emphatic negative, meaning "not at all" or "not even one" <It was not in any way improper> <She did not know any member who was at the event>. (3) In affirmative sentences, it means "every" or "all" <Any attempt to flout the law will be punished> <You are required to produce any documents related to the issue>. (4) In a sentence implying that a selection or discretionary act will follow, it may mean "one or more (unspecified things or people); whichever; whatever" <Any student may seek a tutorial> <Pick any books you like> <a good buy at any price>. (5) In a declarative sentence or imperative involving a qualitative judgment, it means "of whatever kind" <You'll have to take any action you consider appropriate>. In this sense, there is sometimes the implication that the quality may be poor <Any argument is better than no argument>. (6) In a declarative sentence involving a quantitative judgment, it means "unlimited in amount or extent; to whatever extent necessary" <This computer can process any quantity of numbers simultaneously>. In a related colloquial sense, it may mean "of great size or considerable extent" when following a negative <We won't be able to make any real headway this week>.

BRYAN A. GARNER, GARNER'S MODERN AMERICAN USAGE 52 (3rd ed. 2009).[6]

Courts likewise have struggled to define this term. *See, e.g., Snyder Bros., Inc. v. Pa. Pub. Util. Comm'n*, __ A.3d __, 2018 WL 6817092 *14 (Pa. 2018) (recognizing that "any" can mean "all" or "every," as well as "one") (citing BLACK'S LAW DICTIONARY 94 (6th ed. 1991), WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY (2001), and THE AMERICAN

---

[6] Elsewhere, Bryan Garner has observed that, in legislation, "any" "is greatly overworked" and usually can be replaced with the indefinite article "a" or "an" for "heightened readability with no change in meaning." A DICTIONARY OF MODERN LEGAL USAGE 65 (2d ed. 1995).

HERITAGE DICTIONARY 117 (2nd. coll. ed. 1982)); *Commonwealth v. Heller*, 67 A. 925, 926 (Pa. 1907). Consequently, this Court has held that the meaning of "any" is "wholly dependent on the context in which it is used in the particular statute under review." *Snyder Brothers*, at *14; *see also Commonwealth v. Ricker*, 170 A.3d 494, 512 (Pa. 2017) (*per curiam*) (Wecht, J., dissenting) ("'Any,' at first blush a simple word, has variable meanings depending upon the context in which the term is used.").

"A statute is ambiguous when there are at least two reasonable interpretations of the text." *A.S. v. Pa. State Police*, 143 A.3d 896, 905-906 (Pa. 2016). Because the alternative interpretations of "any" offered by the parties both are reasonable, rendering its meaning ambiguous, we resort to the canons of statutory construction. Those canons require us to consider matters beyond the statutory language, including the occasion and necessity of the statute, the mischief to be remedied, and the object to be attained. *See* 1 Pa.C.S. § 1921(c). In addition, we read the sections of Act 6 together, and we construe them to give effect to all of the statute's provisions. *Id.* § 1921(a).

As this Court has explained, "Act 6 is a usury law, designed to protect borrowers against improper mortgage lending practices." *Roethlein,* 81 A.3d at 824.[7] "The comprehensive statutory scheme demonstrates an extensive program designed to avoid

---

[7] *See also Benner v. Bank of Am., N.A.*, 917 F.Supp. 2d 338, 357 (E.D. Pa. 2013) ("Act 6 is a comprehensive interest and usury law with numerous functions, one of which is that it offers homeowners with residential mortgages a measure of protection from overly zealous residential mortgage lenders."); *Bennett*, 554 A.2d at 892 (Papadakos, J., concurring) (observing that the General Assembly enacted Act 6 to assist homeowners who encounter "abuses and hardships occasioned by periods of high unemployment and downturns in the economy"); *Continental Bank v. Rapp*, 485 A.2d 480, 485 (Pa. Super. 1984) ("Act 6 was intended to afford homeowners who were in dire economic straits a measure of protection from over-enthusiastic mortgagees.").

mortgage foreclosures."[8] *Bennett v. Seave*, 554 A.2d 886, 891 (Pa. 1989). In addition to regulating maximum lawful interest rates, Act 6 provides safeguards to residential borrowers before they face foreclosure. Consistent with these remedial purposes, we construe the statute liberally in order to effectuate its aims. *Glover v. Udren Law Offices, P.C.,* 139 A.3d 195, 200 (Pa. 2016).

The General Assembly has identified industry customs that it deems "particularly pernicious," one of which is the initiation of foreclosure with insufficient notice. *Id.* (citing 41 P.S. § 403). In order to remedy this problem, the lawmakers created specific notice requirements to ensure that borrowers are aware not only that they are considered to be in default, but also of the amount required to cure that default and the time within which they may do so.

---

[8] Indeed, the purpose of Act 6 is suggested at considerable length in the title of the statute itself:

> An act regulating agreements for the loan or use of money; establishing a maximum lawful interest rate in the Commonwealth; providing for a legal rate of interest; detailing exceptions to the maximum lawful interest rate for residential mortgages and for any loans in the principal amount of more than fifty thousand dollars and federally insured or guaranteed loans and unsecured, uncollateralized loans in excess of thirty-five thousand dollars and business loans in excess of ten thousand dollars; providing protections to debtors to whom loans are made including the provision for disclosure of facts relevant to the making of residential mortgages, providing for notice of intention to foreclose and establishment of a right to cure defaults on residential mortgage obligations, provision for the payment of attorney's fees with regard to residential mortgage obligations and providing for certain interest rates by banks and bank and trust companies; clarifying the substantive law on the filing of an execution on a confessed judgment; prohibiting waiver of provisions of this act, specifying powers and duties of the [S]ecretary of [B]anking, and establishing remedies and providing penalties for violations of this act.

*General Elec. Credit Corp. v. Slawek*, 409 A.2d 420, 422 n.3 (Pa. Super. 1979); 2008 P.L. 824, No. 57 § 1.

To this end, while Subsection 403(a) describes the circumstances under which Act 6 notice is required, it is Subsection 403(c) that details the content of the notice. The notice must inform the borrower of, *inter alia,* "the right of the debtor to cure the default," "what performance including what sum of money, if any, must be tendered to cure the default," and "the time within which the debtor must cure the default." 41 P.S. § 403(c). Section 404 permits the borrower to cure the default after receiving Act 6 notice "at any time at least one hour prior to the commencement of bidding at a sheriff sale or other judicial sale." 41 P.S. § 404(a).

As the Superior Court explained in *Spivak*, "Act 6 notice enables a financially troubled residential homeowner to learn exactly what sum of money is necessary to cure the mortgage default." *Spivak*, 104 A.3d at 14. This number does not remain static as time passes. To the contrary, compounding interest, late fees, and missed payments accrue steadily. The amount required to cure the default will depend as well upon whether the borrower has made any payments, changes in the escrow portion of the payments, and fluctuations in adjustable rate mortgages.[9]

In view of the statutory language, the occasion and necessity for Act 6, the mischief to be remedied, and the object to be attained, we conclude that Act 6 requires a new pre-foreclosure notice each time the lender initiates a mortgage foreclosure action. It is not sufficient for the lender to recycle a stale notice that preceded a prior action, regardless

---

[9] In view of these fluctuations, the United States Bankruptcy Court for the Eastern District of Pennsylvania has observed that the most important considerations of the Act 6 Notice are whether the borrower can determine the precise amount due to cure the default by referring to the Notice, *In re Mosley*, 85 B.R. 942, 954 (Bankr. E.D. Pa. 1988), and whether the borrower can ascertain how the lender calculated the amount of the default, *In re Miller*, 90 B.R. 762, 768 (Bankr. E.D. Pa. 1988).

of how that action finally was resolved. Notice, and the thirty-day safe harbor period that follows, give the homeowner time to save her home by refinancing or transferring the home to another person who may cure the default. *See* 41 P.S. § 403(c)(6). This also preserves homeownership and minimizes the risk of foreclosure by affording a distressed borrower ample opportunity to cure the default.

The amounts necessary to cure the default, and the calculations used to arrive at this amount, will differ between the first and second action in mortgage foreclosure. So too may the lender's identity and/or contact information. Only by requiring a new Act 6 notice, provided in advance of a new complaint in mortgage foreclosure, will the borrower have the "clear and conspicuous" information that the General Assembly has determined is critical to enable residential homeowners to cure default and avoid foreclosure. *See* 41 P.S. § 403(c). Without such notice, the borrower would be unable to determine the amount required to cure the default prior to the second action, to learn how the lender arrived at this amount, or to know where to send payment.

Indeed, this case exemplifies what can occur with the passage of time between the initial Act 6 notice and the second complaint in mortgage foreclosure. When Chase Bank sent the Notice on April 22, 2010, it was the lender to whom it instructed Taggart to send payment. The amount to cure the default reflected in the Notice was $15,849.39. Several months later, Chase Bank filed the 2010 Action seeking $133,695.24. Years after that action was dismissed, JP Morgan filed the 2013 Action claiming that $164,887.53 was due on the mortgage as of April 9, 2013. Thus, by 2013, the information provided in the 2010 Notice was not just stale, but also completely inaccurate. By failing to send a new Act 6 notice to Taggart before filing the 2013 Action, the lender failed to

inform the borrower of the amount past due, the calculations that led to that amount, the lender's current contact information, and the address to which to send payment.

A new notice under these circumstances also would have effectuated the intent apparent in Subsection 404(a), which provides the time within which the borrower may cure the default. If the lender has not informed the borrower of the payment required to cure the default, and relies instead upon stale notice of a far lesser amount, then the statutory time within which to make the payment becomes meaningless. Here, Taggart was not advised of the amount JP Morgan required to cure the default or the time or manner in which to pay. Instead, the Notice conveyed that a lender that no longer owns the loan (Chase Bank) demanded an amount far less than the current lender (Great Ajax) would accept to cure the default. Thus, relying upon the Notice and the information it provided would have left Taggart well short of the required payment and ignorant of where to send it in any event.

Our decision is consistent with the Superior Court's conclusion in *Spivak*. There, the lender sent Act 6 notice to the borrower, who failed to cure the default. The lender filed a complaint in mortgage foreclosure which it later discontinued. Thereafter, the lender filed a second complaint in mortgage foreclosure, but did not file a second Act 6 notice. After the lender obtained judgment in its favor, the Superior Court reversed. Although the Superior Court found that the plain language of Subsection 403(a) required a new notice before a second action where we find ambiguity, the result is the same: a new, updated Act 6 notice must be provided to the borrower before each mortgage foreclosure action.

In declining to follow its own *Spivak* precedent, the Superior Court in this case observed that the prior action in *Spivak* was withdrawn, while the earlier action in this case was dismissed. This factual distinction is immaterial. Even accepting the Superior Court's rationale that the notice follows the action, such that withdrawing the action likewise withdraws the Act 6 notice, the same analysis would apply to a dismissed action: dismissing a mortgage foreclosure action would likewise dismiss the Act 6 notice upon which the action was based, rendering each a legal nullity.

We reject Great Ajax's argument that this Court should construe Act 6 and Act 91 *in pari materia*. Statutes or parts thereof stand *in pari materia* only "when they relate to the same persons or things." 1 Pa.C.S. § 1932(a). Although there are overlapping circumstances in which both Act 6 and Act 91 apply, *see* 35 P.S. § 1680.403c(b)(1), the two statutes have different points of focus. The purpose of Act 91 is to provide emergency mortgage assistance for primary residences, while that of Act 6 is to provide residential homeowners notice and an opportunity to cure default prior to foreclosure. Although mortgagees will be required to comply with Act 6 and Act 91 in circumstances where both statutes are applicable, Act 91 does not apply in the case before us. As such, it would be beyond the scope of this appeal to address the distinct statutory language contained in Act 91.[10] For the same reason, the Commonwealth Court's decision in *Fish*, 931 A.2d 764, is inapposite. In addition to being decided pursuant to Act 91, rather than Act 6, *Fish*, as a Commonwealth Court decision, does not bind this Court.

---

[10] It is noteworthy that, in 2008, the legislature amended Act 91 to require pre-foreclosure notice to provide "an itemized breakdown of the total amount past due." 35 P.S § 1680.403c(b)(1).

Finally, we disagree with Great Ajax that it is impracticable or unreasonable to require notice prior to each foreclosure action. As the Superior Court observed in *Spivak,* "logic dictates that it is not only practical and reasonable to require a second notice, but necessary to effectuate the debtor's statutory right to cure the default under Act 6." 104 A.3d at 17.

Accordingly, we conclude that Subsection 403(c) requires the lender to provide a second pre-foreclosure notice prior to initiating a second mortgage foreclosure action. Our holding best serves the remedial purposes of Act 6, reflecting the expressed legislative intent to impose a robust notice requirement prior to initiation of any mortgage foreclosure action, without exception. Great Ajax's predecessor, JP Morgan, was required to deliver a new Act 6 notice prior to initiating the second foreclosure action.

The Superior Court's order is reversed, and the case is remanded for further proceedings consistent with this decision.

Chief Justice Saylor and Justices Baer, Todd, Donohue and Dougherty join the opinion.

Justice Mundy files a concurring opinion.