J-A03035-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| FIRSTRUST BANK | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WILKINSON ROOFING AND SIDING, | : | |
| INC.  EQUITABLE PROPERTY | : | |
| INVESTMENTS, I, LLC 20 WEST | : | No. 1108 EDA 2021 |
| PARK, LLC  KENNETH S. BALAGUR | : | |
| KIMBERLY A. REITZ RICHARD | : | |
| BALAGUR | : | |
| | : | |
| | : | |
| APPEAL OF: 20 WEST PARK, LLC | : | |
| AND RICHARD BALAGUR | : | |

Appeal from the Order Entered May 6, 2021
In the Court of Common Pleas of Chester County
Civil Division at No:  2019-02916-MJ

BEFORE:  STABILE, J., DUBOW, J., and McCAFFERY, J.

CONCURRING/DISSENTING MEMORANDUM BY STABILE, J.:

**FILED APRIL 11, 2022**

Respectfully, I dissent from the learned Majority's conclusion to affirm the trial court's grant of summary judgment in favor of Appellee Firstrust Bank ("Firstrust") on the basis that the contractual provision at issue is unambiguous.  The Majority affirms the trial court's conclusion that this provision may be interpreted as a matter of law to provide Firstrust a mortgage lien of 45% of the sale proceeds in the New Hampshire Property[1]

---

[1] For sake of consistency, references herein to the "New Hampshire Property", "Appellants", "Appellee", "20 West Park", "Note", "Guarantee", "Mortgage", and "Loan Agreement" shall be as defined in the Majority's memorandum.

after satisfaction of the two more senior Mascoma Bank liens. In my opinion, the flaw in this analysis is that it does not recognize the ambiguity created by reference to both a "lien" secured by a mortgage in real estate and a limited liability company "member interest" in that real estate for purposes of declaring Firstrust's interest in the sale proceeds of the the New Hampshire Property. Because I believe the use of both terms to refer to Firstrust's interest in the sale proceeds renders the contractual provision ambiguous, I would reverse the trial court's grant of summary judgment and remand for an evidentiary hearing for the trial court to consider extrinsic evidence in order to make appropriate findings of fact as to the intent of the parties when drafting this provision. I further believe the Majority errs by considering extrinsic evidence and by invoking the presumption against draftsmanship. I concur, however, with the Majority's rejection of Appellants' last issue that the contract fails for lack of consideration.

I begin with a reproduction of the contractual provision at issue recited in various of the loan documents, and in particular, the Mortgage, without a detailed recitation of the background facts, as the Majority aptly has set forth those details.

Paragraph 2.1(e) of the Mortgage, repeated in other of the loan documents, provides:

> The amount of this mortgage is $1,300,000.00. Notwithstanding that, **upon the sale of the Property the Mortgagee agrees to release its lien and to limit its interest in the Property to 45% of the proceeds received from the sale of the Property**

after the first lien to Mascoma Savings Bank in the original amount of $1,045,000.00 and second lien to Mascoma Savings Bank in the original amount of $300,000.00 (and a maximum amount of $450,000.00) are satisfied. **The 45% represents Kenneth S. Balagur's membership interest in [20 West Park], which is the owner of the [New Hampshire] Property.**

(Emphasis added). In this action for declaratory judgment, Firstrust alleges that based upon the foreclosure of its mortgage lien, it is entitled to *45% of the proceeds* of the sale of the New Hampshire Property following payment of the two more senior Mascoma Bank liens. Appellants, 20 West Park and Richard Balagur ("Balagur"), disagree, and assert that Firstrust instead, is limited to the *45% membership interest* that Kenneth Balagur ("Ken Balagur") has in the sale proceeds of the New Hampshire Property after satisfaction of the Mascoma Bank liens. The competing positions of the parties demonstrate on their face that an ambiguity exists in this provision by reference to both a "lien" and a "membership interest" in the sale proceeds. To understand why reference to both the terms "lien" and "member interest" in the provision create an ambiguity, it is necessary to explore briefly the difference between a mortgage lien in real estate and a member interest in a limited liability company that owns real estate.

"It is well settled in Pennsylvania that a mortgage, although in form a conveyance of title, is in reality only a security for payment of money or performance of other collateral contract." ***Winthrop v. Arthur W. Binns, Inc.***, 50 A.2d 718, 719 (Pa. Super. 1947). "Pennsylvania recognizes mortgages as acting both as conveyances and as security interests or liens."

*Pines v. Farrell*, 848 A.2d 94, 100 (Pa. 2004) (citation omitted). "As between the parties it is a conveyance so far as is necessary to enforce it as a security." *Winthrop*, 50 A.2d at 719. "Although the mortgagor remains the real owner of the mortgaged property, the mortgagee is entitled to its possession, to be held as security until his debt is paid." *Id.* "A mortgage is in essence a defeasible deed, requiring the grantee to reconvey the property held as security to the grantor upon satisfaction of the underlying debt or the fulfillment of established conditions." *Hahnemann Med. Coll. & Hosp. of Philadelphia v. Com*, 416 A.2d 604, 607 (Pa. Cmwlth. 1980) (citing *HanePayne's Administrator v. Patterson's Administrator*, 77 Pa. 134, 137 (1874)). The term "lien" expresses a broad concept embracing a variety of security devices both legal and equitable. *Anderson Contracting Co. v. Daugherty*, 417 A. 2d 1227 (Pa. Super. 1979), *appeal denied*, 425 A.2d 329 (Pa. 1980). The word "lien" is of the same origin as the word "liable", and the right of "lien" expresses the liability of certain property for a certain legal duty, or a right to resort to it in order to enforce the duty. *Id.* (citing *Wood's Appeal*, 30 Pa. 274, 277 (1858)). In more simple terms, a mortgage may be defined as any obligation evidenced by a security document and secured by a lien upon real property. *See Bennett v. Seave*, 554 A. 2d 886, 891 (Pa. 1989) (citing 41 P.S. § 101 (Act 6) and 35 P.S. § 1680.401c(a) (Act 91)). It is a specific lien against a particular piece of real property. *PNC Bank, Nat. Ass'n v. Balsamo*, 634 A.2d 645, 650 (Pa. Super. 1993), *appeal denied*, 648 A.2d 790 (Pa. 1994).

A member interest in a limited liability company is an entirely different creature from a mortgage lien. To illustrate, a limited liability company in Pennsylvania,[2] is an entity distinct from its member or members and has perpetual duration. 15 Pa.C.S.A. § 1818(a) and (c). It has the power to do all things necessary or convenient to carry on its activities and affairs. 15 Pa.C.S.A. § 8819. It has the legal capacity of a natural person to act, **see id.** *cmt.*, and this of course would permit ownership of real estate. An LLC has an "operating agreement" that governs the relations among members and

---

[2] Limited liability companies are governed in Pennsylvania under the Pennsylvania Uniform Limited Liability Company Act of 2016 (the "LLC Act"). 15 Pa.C.S.A. §§ 8811 - 8898. 20 West Park, LLC, is a New Hampshire limited liability company. The New Hampshire Revised Limited Liability Company Act, §§ 304-C:1 *et. seq*, is substantially similar to Pennsylvania with regard to the formation and the treatment of member interests. I recognize that this litigation began in New Hampshire and that the Superior Court of New Hampshire determined that this matter had to be litigated in Pennsylvania based upon the forum selection clause in the Loan and Security Agreement that provides that all disputes arising out of or under the loan documents shall be litigated in Pennsylvania. The New Hampshire Court, however, only determined the forum in which the parties had to litigate. The court did not resolve any choice of law issues relating to interpretation of the loan agreements. **See** New Hampshire Superior Court order, 2/27/19, at 3, 6. I likewise do not attempt to resolve any such conflict of law issues, but merely use Pennsylvania's statute to illustrate the nature of a LLC member interest which I believe for present purposes is sufficiently aligned with New Hampshire's law to demonstrate the point. In passing, I also note that the Loan and Security Agreement provides that the agreement and all other loan documents are to be governed by and construed in accordance with Pennsylvania law. Loan Documents are defined to include all other documents, certificates and instruments executed and delivered by the obligors in connection with, or for the benefit of, Firstrust. In contrast, the Mortgage provides it shall be governed by the laws of the state of New Hampshire. In addition to any potential conflict of law issues, it is possible that conflicts between the applicable law provisions contained within these documents also may have to be reconciled.

between members and the LLC, the rights and duties as a member or manager, the activities and affairs of the LLC, the means for amending an operating agreement, and the means and conditions for approving entity transactions. 15 Pa.C.S.A. § 8815(a). A person becomes a member in an LLC at the time of formation, or as provided for in the operating agreement. 15 Pa.C.S.A. § 8841(a), (b), and (d). As seems typical, Pennsylvania's LLC Act does not specify the manner in which member ownership in a limited liability company is evidenced. Membership interests, however, are typically stated in terms of percentage interests or membership units. Membership carries with it both the rights of a member and a transferable interest, or in other words, both a non-economic and an economic interest. *See* 15 Pa.C.S.A. § 8852(g). A "transferable interest" is the right to receive distributions. *See* 15 Pa.C.S.A. § 8812 (definition of "Transferable interest"). A person may not transfer any rights in a limited liability company other than a transferable interest. 15 Pa.C.S.A. § 8851(b). When a member transfers a transferable interest, the member retains the rights, duties, and obligations of a member other than the transferable interest. 15 Pa.C.S.A. § 8852(g). Importantly, a member's interest in a limited liability company is considered personal property. 15 Pa.C.S.A. §§ 8841(f) and 8851(a). A judgment creditor of a member cannot execute on a member's transferable interest. Rather, a judgment creditor must secure from a court a charging order against the transferable interest of the judgment debtor member. *See* 15 Pa.C.S.A. § 8853. The charging order then operates as a lien on the judgment debtor

member's transferable interest and obligates the limited liability company to pay to the judgment creditor any distributions that otherwise would be paid to the judgment debtor member. *Id.* A member's judgment creditor does not have the right to foreclose upon the whole of a limited liability company's assets to satisfy the debt owed by a single member. More to the point, a "member interest", whether expressed as a percentage or in membership "units", represents ownership in the legal entity, the LLC, and not in the assets owned by the LLC. The value of a member's interest in the LLC is not measured by any single asset owned by the LLC, but is determined under the LLC's operating agreement and/or applicable law. The value of a member's interest also may vary depending upon, for instance, whether the LLC continues to operate or is in liquidation. A member's transferable interest or economic interest in an LLC entitles the member to distributions of money from the LLC. *See* 15 Pa.C.S.A. §§ 8812, 8844. However, a member's right to distributions may depend upon consideration of such things as the book value of the company's assets and liabilities and depreciation. *See* 15 Pa.C.S.A. § 8845. In case of dissolution, return of contributions also has to be considered. 15 Pa.C.S.A. § 8877.

In simple terms, a mortgage lien encumbers real estate as collateral to secure an underlying obligation. In contrast, a member interest in an LLC is ownership treated as personalty measured by the percentage of or units held by the member interest. The value of a member interest or ownership in an LLC cannot be determined by simply calculating the member's percentage

interest as against the company's assets. Instead, the interest must take into consideration other factors incident to valuing the LLC in order to determine the value of a member interest. With respect to real estate, a member has an indirect interest in the real estate through ownership in the LLC, but the member has no direct ownership rights in the real estate solely as a result of membership in the LLC. Undoubtedly, Firstrust understood these distinctions when it insisted that Ken Balagur pledge all his assets in consideration of the $1.3 million loan to his company. It realized that it could not directly lien the New Hampshire Property through Ken Balagur's member interest in 20 West Park and that Ken Balagur could not pledge the New Hampshire Property. It therefore, had to have 20 West Park agree to mortgage the the New Hampshire Property so that in the event of foreclosure it could collect on Ken Balagur's membership interest in the proceeds.

The difference between a "mortgage lien" and a "member interest" in an LLC confirm the tension and ambiguity created by Paragraph 2.1(e) of the Mortgage and related loan documents that reference both Firstrust's mortgage lien and Balagur's 45% membership interest in 20 West Park to define what portion of the sale proceeds of the New Hampshire Property are to be paid to Firstrust upon foreclosure. It is a simple matter to determine what amount Firstrust is entitled to collect on its mortgage lien under the second sentence of Paragraph 2.1(e) if one need only consider a mortgage lien. Firstrust would be entitled to collect on its mortgage lien 45% of the sale proceeds from foreclosure on the New Hampshire Property after satisfaction of the two senior

Mascoma Bank liens. The relatively straightforward application of that second sentence, however, is complicated by the third sentence that declares that the 45% interest referenced in the second sentence represents Ken Balagur's 45% membership interest in 20 West Park.

Assuming for the moment that Section 2.1(e) is to be construed as a lien but measured by an ownership interest, then calculation of Ken Balagur's member interest in the sale proceeds becomes more complicated. As Firstrust concedes in its brief, the determination of Ken Balagur's 45% membership interest in the sale proceeds of the the New Hampshire Property would require that someone (presumably an expert) provide an opinion as to the value of that membership interest. *See* Firstrust's Brief at 12. The importance of this distinction also was noted by Firstrust to the trial court when it stated that the document was not a pledge of a membership interest, that it was a mortgage, and that there is a major difference between those two types of collateral. *See* Majority Memorandum at n.14 (citing N.T., Hearing, 4/22/21, at 22-23.) Within the record there also exists an illustration prepared by Richard Balagur demonstrating that the difference in value to be paid to Firstrust as between a 45% mortgage lien and a 45% mortgage lien limited to Ken Balagur's equity interest in the LLC is twofold. *See* Equity Distribution from 20 West Park, LLC as of 12/31/14, Prepared by Richard Balagur. In coming to a value of Ken Balagur's membership interest in the LLC, the illustration takes into consideration things such as subordinated debt, tenant security deposits, New

Hampshire business profits tax, and a bonus to Balagur.[3]  Therefore, I must respectfully and strongly disagree with the Majority's statement that "the question of 'membership interest' versus 'property interest' is a distinction without a difference as the sole asset of 20 West Park was the New Hampshire Property.  Therefore, Kenneth Balagur's interest solely derived from that property."  Majority Memorandum at 18-19.  This statement fails completely to acknowledge the nature of ownership in an LLC (as the parties do), as opposed to the simple concept of a mortgage lien that merely encumbers real estate to secure an underlying obligation.

It has been suggested by Firstrust, the court, and the Majority that interpretation of Section 2.1(e) is somehow affected by the fact that it was 20 West Park, and not Ken Balagur, that granted the mortgage lien.  Certainly, the mortgage lien granted by 20 West Park is what gave Firstrust the right to foreclose on the New Hampshire Property.  I fail to see how this impacts the distinction between a mortgage lien and a member interest when discussing the value to be received by Firstrust.  Although 20 West Park, as owner of the the New Hampshire Property, executed the Mortgage, the operative provision

---

[3] I offer no opinion as to the correctness of this illustration in valuing Ken Balagur's membership interest.  The exhibit merely demonstrates, as Firstrust concedes, that the value of a mortgage lien and the value of a membership interest are two different things.  It does appear that the illustration is based upon a liquidation value, as the record reflects that the New Hampshire Property is the sole principal asset of the company.

regarding distribution of sale proceeds to Firstrust still is defined by Ken Balagur's 45% membership interest.[4]

In **Hutchinson v. Sunbeam Coal Corp.**, 519 A.2d 385 (Pa. 1986), our Supreme Court set forth basic rules of contract interpretation pertinent to this appeal.

> Determining the intention of the parties is a paramount consideration in the interpretation of any contract. The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous. However, . . . where an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances.
>
> We first analyze the contract . . . to determine whether an ambiguity exists requiring the use of extrinsic evidence. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. The court, as a matter of law, determines the existence of an ambiguity and interprets the contract whereas the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact.

---

[4] Firstrust expresses concern in its brief that accepting Appellants' interpretation would mean that the bank could take collateral subject to dilution, *i.e.*, 11%, since as the trial court noted, there is nothing in the loan documents that restricts or comments on the ability of Ken Balagur to transfer or encumber his membership interest. Firstrust's Brief at 20; Trial Court Opinion n.3. I would not construe Section 2.1(e) to permit such a result, since the unambiguous language grants a 45% interest. The percentage was fixed as of the time the loan documents were executed—not as of the time of any potential foreclosure. The question remains whether that percentage pertains to the priority of a mortgage lien or to Ken Balagur's 45% member interest in the remaining proceeds after all other required adjustments and distributions are made first.

*Id.* at 389-90 (citations and quotation marks omitted). Under these aforementioned principles, I conclude that the second and third sentences to Paragraph 2.1(e) of the Mortgage, and as contained in other of the loan documents, indeed create an ambiguity. It is unclear whether 20 West Park simply agreed to grant Firstrust a mortgage lien in the New Hampshire Property based upon 45% of the sale proceeds which equate to Ken Balagur's 45% membership interest in the company, or whether 20 West Park only agreed to lien Ken Balagur's 45% membership interest in the remaining proceeds after sale of the the New Hampshire Property. Both interpretations may be deemed reasonable considering the possible intent of the parties under the loan documents. On the one hand, Firstrust could reasonably argue its only interest in the sale proceeds was to secure 45% of those proceeds regardless of any internal membership interest considerations. On the other hand, Appellants 20 West Park and Ken Balagur could reasonably argue that 20 West Park had no interest in the loan extended by Firstrust to benefit Ken Balagur and his company, Wilkinson Roofing and Siding, Inc., and that it would reasonably make sense that the only proceeds Firstrust could lien would be those that would be paid as against Ken Balagur's membership interest. To resolve this ambiguity extrinsic evidence had to be considered by the trial court, thus creating triable issue of fact precluding the entry of summary judgment. The record is full of testimony and evidence to argue either position.

Although the trial court had ample testimony and evidence before it when deciding the parties' competing summary judgment motions, its decision was not based upon any of that evidence. It was the trial court's conclusion that Section 2.1(e) could be interpreted as a matter of law, since it believed the only reasonable interpretation was one whereby Firstrust agreed to limit its mortgage lien in the the New Hampshire Property to a percentage *equal to* that of Ken Balagur's interest in 20 West Park. Trial Court Memorandum, 5/6/21, at 5. Reading the third sentence as only describing a 45% interest in sale proceeds, however, ignores any reference to Ken Balagur's membership interest as a modifier to the second sentence and the legal ramifications that flow from membership status. If as the trial court contends, the third sentence merely was intended to restate that Firstrust was entitled to 45% of the sale proceeds after satisfaction of the two senior liens, then the third sentence is rendered superfluous. This violates rules governing contract interpretation, since all words in a contract are to be given meaning. "Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed." *Murphy v. Duquesne Univ. Of The Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) (citation omitted). A cardinal rule of contractual interpretation counsels against rendering words or provisions meaningless. *Pac. Emps. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F. 3d 417, 430 (3d Cir. 2012) (citing, *Morris v. Am. Liab. & Sur. Co.*, 185 A. 201, 202 (Pa. 1936)). Therefore, if we are to give meaning to all words chosen by the parties, and if doing so

reveals ambiguity, extrinsic evidence must be considered to determine the intent of the parties. The trial court simply chose to ignore the third sentence modifier and further, chose to focus on what was not in the record, as opposed to what was in the record regarding the parties' intentions on this provision.

The Majority similarly concludes that the third sentence does not create an ambiguity because it merely explains why Firstrust's recovery was limited to "45% of the proceeds from the sale of the Property." Rather than creating an ambiguity, the Majority maintains the sentence is declaratory and explains the understanding that Ken Balagur owned only 45% of the LLC that owned the the New Hampshire Property. The Majority concludes that Firstrust was precluded from attempting to recover more of the proceeds from the sale of the New Hampshire Property than Ken Balagur would be entitled upon the sale. Ken Balagur, however, was not entitled to receive 45% of the sale proceeds. He only was entitled to receive his 45% interest in them after all other company obligations were satisfied before surplus could be distributed to the members. Read in context to the transaction as a whole, the Majority further concludes the third sentence appears to have been included by Ken Balagur to insulate the 55% interest of his partners [sic] from execution by Firstrust. Majority Memorandum at 17-18. Respectfully, this part of the Majority's rationale in fact demonstrates why there is an ambiguity in these provisions. It treats Ken Balagur's 45% membership interest as equivalent to a 45% mortgage lien. Construing Firstrust's recovery to 45% of the sale proceeds as measured by the percentage of Ken Balagur's member interest

- 14 -

would not necessarily insulate the 55% interest of the other members. A recovery of 45% of the sale proceeds may well include amounts in excess of Ken Balagur's 45% membership interest after adjustments and could distribute to Firstrust some part of the proceeds that belong to the other 55% member(s). Both Firstrust and Balagur agree that there is a difference in value between a 45% mortgage lien and Ken Balagur's 45% member interest in the sale proceeds. *See*, *supra*.

In reaching its conclusion that the trial court should be affirmed because Section 2.1(e) of the Mortgage is clear, the Majority also strays into considering extrinsic evidence to bolster this conclusion and to construe the provision against 20 West Park, noting that the third sentence was included at the direction of Ken Balagur.[5] The Majority observes that although the loan documents were drafted by Firstrust, the sentence in question was included at the direction of Ken Balagur who reviewed and consented to its inclusion. Majority Memorandum at 17. The Majority cites an email from Ken Balagur and statements by counsel to find that Ken Balagur was the drafter of the third sentence to conclude that the third sentence cannot be construed against Firstrust. *Id.* (citing, *State Farm Fire and Cas. Co. v. PECO*, 54 A.3d 921, 928 (Pa. Super. 2012) (where the language of a contract is ambiguous, the provision is to be construed against the drafter)). I believe the error here is twofold.

---

[5] The Majority must assume that in drafting this provision that Ken Balagur was acting on behalf of 20 West Park.

First, if the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained solely from the writing, without reference to any external testimony or other evidence. **Hutchison**, **supra**. The trial court did not consider extrinsic evidence. The Majority does so in order to buttress its interpretation of Section 2.1(e). This is error. Second, the Majority compounds this error by invoking the presumption against draftsmanship without first requiring that the trial court consider extrinsic evidence to ascertain the intent of the parties. In **Burns Manufacturing Company, Inc. v. Boehm**, 356 A.2d 763 (Pa. 1976), the Court stated the following when the chancellor in that case invoked the presumption against draftsmanship before determining that no extrinsic evidence could explain the intent of the parties.

> The chancellor made no apparent attempt to construe the language of the addendum clause in light of the circumstances which surrounded its execution. Instead he appears to have relied on the apparent imprecision of the language as a sufficient basis to rule against appellan. This, in our view, is not a satisfactory approach to the construction of the facially ambiguous language contained in the addendum. While it is a well settled rule of construction that in cases of ambiguity, leases and grants should be construed most strongly against the drafter; it is equally clear that the rule is not intended as a talismanic solution to the construction of ambiguous language. Rules of construction serve the legitimate purpose of aiding courts in their quest to ascertain and give effect to the intention of parties to an instrument. They are not meant to be applied as a substitute for that quest. **Where a document is found to be ambiguous, inquiry should always be made into the circumstances surrounding the execution of the document in an effort to clarify the meaning that the parties sought to express in the language which they chose**. **It is only when such an inquiry fails to clarify the ambiguity that the rule of construction relied upon by the chancellor should be used to conclude the**

- 16 -

**matter against that party responsible for the ambiguity, the drafter of the document**.  Because, however, we are able to decide the issue on the theory of easement by implied reservation there is no need to engage in an analysis of the language of the addendum.

*Id.* at 767 n.3.  (citations omitted) (emphasis added).  I already stated my view that if the Majority found the provision at issue to be clear, then it could proceed no further to consider extrinsic evidence in order to bolster its interpretation as a matter of law.  The same concern holds true with respect to the invocation of the presumption against draftsmanship.  The presumption has no place in interpretation if, as the Majority concludes, the provision is clear and unambiguous.  Even if the Majority would agree that the provision is ambiguous, as I contend, it still improperly invokes the presumption against draftsmanship because extrinsic evidence of the parties' intent has not been reviewed to determine if that evidence may clarify the meaning of the provision.  If, and only if, extrinsic evidence is not capable of ascertaining the intent of the parties may the court then, as a last resort, invoke the presumption against draftsmanship as an aid to interpretation.  And of course, the task of making those findings is for the trial court.

Finally, I do concur in the Majority's holding that it was not error for the trial court to fail to consider that 20 West Park received no consideration for the transaction.  Firstrust argues, and the Majority agrees, that the issue of consideration was not properly before the trial court, since this is a declaratory judgment action as to the meaning of the contract and not an action to enforce the Mortgage.  I agree, but wish to offer a more substantive reason for

rejecting this argument. The record reflects that on February 17, 2019 and October 28, 2018, Richard Balagur and Kenneth Balagur, respectively, representing 100% of the membership having a voting and controlling stake in 20 West Park, amended the company's operating agreement to memorialize the basis upon which the company was willing to pledge as collateral Ken Balagur's 45% equity in the company to secure a bank loan related to his other private investments. The approved amendment states:

> It is agreed that it in exchange for a waiver of the LOC credit guarantee fee currently paid to Kenneth Balagur and his agreement to waive interest payments if the LLC manager determines that to be advantageous, Kenneth Balagur may enter into an agreement where his 45% equity in 20 West Park, LLC is pledged as collateral to secure a bank loan related to his other private investments. This pledge of collateral may be evidenced or secured as required by the lending institution provided that as part of any recording of a lien, security filing or mortgage that within the public record there is clear wording that even if a mortgage reflects a security interest in the whole building that that the banks [sic] interest is limited to Kenneth Balagur's equity position and that the balance of the buildings [sic] equity remains with the other financial owners of the LLC, excluding Kenneth Balagur's equity.

20 West Park, LLC Operating Agreement Amendment, Trial Exhibit No. 39. It is evident from this document alone that consideration was in fact given in exchange for 20 West Park executing the loan documents, and in particular, the Mortgage. It did so in order to facilitate the Firstrust loan to Ken Balagur and his company. Apparently, Ken Balagur was willing to waive a LOC credit guarantee fee and interest payments in exchange for 20 West Park agreeing

- 18 -

to encumber his membership interest in favor of Firstrust extending the loan to Ken Balagur's company.

For the foregoing reasons, I respectfully dissent from the Majority's decision to affirm the grant of summary judgment in favor of Firstrust. I concur in its disposition of Appellants' last claim regarding the lack of consideration for this transaction. Further, I would deny Appellants' request that summary judgment be entered in its favor, as factual questions remain as to the intentions of the parties with respect to the contractual provision at issue contained within the Mortgage and the other loan documents.